2005 OK 4

**Barbara KING, Defendant/Appellant,**

v.

**Anthony KING, Plaintiff/Appellee.**

No. 99,248.

Supreme Court of Oklahoma.

Feb. 1, 2005.

Charles L. Hill, Norman, for Plaintiff/Appellee.

Spencer Ford Shroeder, Chickasha, for Defendant/Appellant.

KAUGER, J.:

¶1 We granted certiorari to consider a single first impression issue: whether a prevailing parent, demonstrating good cause for withholding court-ordered visitation, is entitled to appeal-related attorney fees pursuant to 43 O.S. Supp.2003 § 112(D)(2).[1] We determine that the statute supports an award

---

1. In addition to the mother's request for appeal-related attorney fees, she also filed a motion to tax costs. Pursuant to 12 O.S.2001 § 978, the mother is entitled to $200.00 for filing the petition in error and the sum of $502.55 as taxable costs. The request for $111.32 for copying and

of appeal-related attorney fees. Furthermore, the defendant/appellant, Barbara King (mother) is entitled to recover such fees because: 1) she demonstrated good cause for withholding visitation—the possibility of the child's sexual abuse by others while in the custody of the plaintiff/appellee, Anthony King (father)—and the threat of termination of parental rights should she allow the visitation to continue; 2) 43 O.S. Supp.2003 § 112(D)(2)[2] provides in clear, explicit, mandatory and unmistakable terms that when an action is brought under the statute which is contrary to the best interests of the child, the prevailing party **shall**[3] be entitled to recover court costs, attorney fees and any other costs and expenses incurred in the action. The father brought the action, the mother presented evidence of good cause for denying the visitation and presented sufficient evidence to rebut the argument that a change of custody was in the child's best interest. She is a prevailing party entitled to recover un-

der the statute, and appeal-related attorney fees are recoverable if statutory authority exists for their award in the trial court.[4] Section 112(D)(2) provides specific statutory authority for such an award. The mother is entitled to recover attorney fees on appeal. Finally, even if statutory authority for the award of attorney fees did not exist, the equities support an award to the mother who was forced either to discontinue visitation pending an investigation of the sexual abuse allegations or face the possible loss of her child to Kansas child welfare authorities. Therefore, we leave the Court of Civil Appeals opinion undisturbed.

## FACTS

¶2 Neither parent is accused of abusing their child. Rather, the abuse allegations are directed at the child's uncle[5] who acted as a part-time minister in the congregation where the family attended services before the divorce.

---

binding of the brief in chief is denied. Title 12 O.S.2001 § 978 provides:

"When a judgment or final order is reversed, the plaintiff in error shall recover his costs, including the costs of the transcript of the proceedings, or case-made, filed with the petition in error, and when reversed in part and affirmed in part, costs shall be equally divided between the parties."

Although the petition for certiorari was filed by the father and granted by this Court's order of October 21, 2004, we leave the Court of Civil Appeals opinion undisturbed.
The dissent asserts that this Court is without authority to award the mother's appeal-related attorney fees. The contention directly conflicts with case law providing that the original right to appeal-related attorney fees are established in the appellate court. *GRP of Texas, Inc. v. Eateries, Inc,* see note 53, infra; *Chamberlin v. Chamberlin,* see note 53, infra. Furthermore, in at least two opinions, the Court has established that we are the determining tribunal regarding the right for appellate attorney fees in matrimonial litigation. *Larman v. Larman,* see note 56, infra; *Harmon v. Harmon,* see note 56, infra. See also, *Phillips v. Phillips,* note 56, infra. Finally, 20 O.S.2001 § 15.1 provides:
"On any appeal to the Supreme Court, the prevailing party may petition the court for an additional attorney fee for the cost of the appeal. In the event the Supreme Court or its designee finds that the appeal is without merit, any additional fee may be taxed as costs."
The allegation that this Court is acting as a "fact finder" is also unmeritorious. The opinion specifically provides that the Court of Civil Appeals

opinion—reciting the facts as presented in the trial court—shall remain unaffected.

2.  Title 43 O.S. Supp.2003 § 112(D) provides:

"1. Except for good cause shown, a pattern of failure to allow court-ordered visitation may be determined to be contrary to the best interests of the child and as such may be grounds for modification of the child custody order.
2. For any action brought pursuant to the provisions of this section which the court determines to be contrary to the best interests of the child, the prevailing party shall be entitled to recover court costs, attorney fees and any other reasonable costs and expenses incurred with the action."

3.  Generally, when the Legislature uses the term "shall", it signifies a mandatory directive or command. *Tulsa County Budget Bd. v. Tulsa County Excise Bd.,* 2003 OK 103, ¶13, 81 P.3d 662; *Keating v. Edmondson,* 2001 OK 110, ¶13, 37 P.3d 882; *United States through Farmers Home Admin. v. Hobbs,* 1996 OK 77, ¶8, 921 P.2d 338. Nevertheless, the term can be used permissively, *Minie v. Hudson,* 1997 OK 26, ¶7, 934 P.2d 1082; *Texaco, Inc. v. City of Oklahoma City,* 1980 OK 169, ¶0, 619 P.2d 869.

4.  *Hough v. Hough,* 2004 OK 45, ¶13, 92 P.3d 695; *Finnell v. Seismic,* 2003 OK 35, ¶22, 67 P.3d 339; *Casey v. Casey,* 2002 OK 70, ¶26, 58 P.3d 763.

5.  The uncle is not referred to by name as two different spellings for the uncle's name are found in the divorce decree issued on October 8, 2002,

¶ 3 The parties were married in 1998, and the only child of the marriage was born the same year. The mother moved to Kansas in December of 2000. The father filed for divorce the next March and the matter was tried in May and July of 2002. It appears that the divorce was granted on July 31, 2002. However, the decree was not filed until October 8, 2002. During the proceedings and before the filing of the decree, the mother accused the uncle of child abuse. Although we do not have the record associated with the divorce action, it is apparent that the trial court gave some credence to the mother's concerns. The decree specifically provides that the child is not to be around the uncle even in a worship setting.[6] Custody was placed with the mother and the father was afforded standard visitation.

¶ 4 Because of the mother's failure to provide the child for court-ordered visitation and her unfounded abuse contentions, the

father filed a motion to modify on September 9, 2002, asserting that it would be in the best interests of his son to change the custodial arrangement. Here, the specific allegations arose following a visit with the father in November of 2002.

¶ 5 After picking up the child, the mother stopped at her niece's home. Although the father testified that the child was never in his uncle's presence,[7] the mother stated that during this rest stop the child was visiting with his cousin when the cousin came into the living room and told his mother that the child had pulled down his pants and was playing with his private parts. When the mother asked her son why he was misbehaving, the child allegedly told her that his uncle "stretches his pee pee".[8] These allegations were corroborated by the niece[9] who testified that she believed the child was talking about a recent incident.[10]

¶ 6 The mother filed a child abuse report with the Kansas police which listed the

and in the transcripts and other places in the record.

6. Decree of Divorce, filed on October 8, 2002, providing in pertinent part at p. 3:
   "... That [the uncle] is not to be around the minor child, including going to church, until further order of the Court...."

7. Transcript of proceedings, March 28, 2003, the father testifying in pertinent part at p. 28:
   "... Q. Okay, and do you believe any of these allegations ever happened?
   A. Well, no and the reason being is he's always with me.
   Q. Okay. You've never left him alone with [the uncle] or anything?
   A. Never...."

8. Transcript of proceedings, March 28, 2003, the mother testifying in pertinent part at pp. 67–68:
   "... Q. At your niece's house this time.
   A. Okay. I picked [the child] up at the police department. [The child] said that he didn't see [the uncle]. But the time before, he said that he did. And I stopped at my niece's because he's been riding since Newcastle, Oklahoma and I figure he's tired, he needs to stretch his legs just a couple of minutes, you know, let him rest. And [the child] and my niece's little boy always play real good together. He's three and Christopher is his name. And they ran in—as soon as I got there, [the child] ran in the bedroom to play with Christopher and me and my niece sat down and was talking in the living room. And pretty soon, here come Christopher running in the living room and

said [the child] pulled down his pants and is playing with his pee pee. And me and my niece called—I called [the child] in there and I said '[to the child] come here. Why are you doing this?' And he told me that [the uncle] stretches his pee pee. That's exactly what he said...."

9. Transcript of proceedings, March 28, 2003, Samantha Dutton testifying in pertinent part at p. 89:
   "... Q. Okay. Why don't you tell the Court about it?
   A. My three-year-old and [the child] were in the bedroom playing. My three-year-old, me and my aunt were in the living room talking. My three-year-old runs into the living room and says, 'Mama, Boo Boo showed me his pee pee.' So my Aunt Barbara calls Boo Boo—which Boo Boo's [the child's] nickname—into the living room and says, 'Why are you doing that?' And he said, '[The Uncle] broke my pee pee.' And I was like, '[The uncle] broke your pee pee?' And he goes, 'Yes.' And I said, 'Where did [the uncle] break your pee pee?' And he said, 'At the chur'—no—'In the bathroom.' And I said, 'What bathroom did he break your pee pee in?' And he goes, 'At the church bathroom.' And then my aunt told me that she was leaving and was going to take [the child] and go talk to the police...."

10. Transcript of proceedings, March 28, 2003, Samantha Dutton testifying in pertinent part at p. 95:
    "... Q. Okay. When Anthony talked to your [sic] or made the statement about this allega-

abuse as occurring on November 23rd. On December 16, 2002, the mother took the child to counseling with Glenda Rodgers (Rodgers/counselor) who had treated the child after the initial abuse allegations. In this session, Rodgers engaged the child in play therapy where he revealed that the uncle had pulled on his pee pee.[11] Rodgers not only concluded that the child had been with the uncle, but that the visit occurred while the child was in the father's custody, perhaps while at worship service, and that it was recent.[12]

¶ 7   Rodgers was concerned enough about the child having been abused that she wrote the mother a letter the day of the counseling

session. In that letter, she told the mother that she was reporting the abuse to SRS— evidently the Kansas agency equivalent to Oklahoma's Department of Human Services which subsequently determined the claim was substantiated.[13] She also told the mother that if visitations continued, she would file a child in need of care petition to protect the child from the uncle. The counselor also stated that if the petition were filed, the child could be removed from the mother's home and placed in SRS custody. The mother was also told that her parental rights could be terminated if the investigation found that she failed to protect her child.[14]

¶ 8   The Chickasha police received a documentation report from the Kansas police and

---

tion, did—when he was making—did it seem like he was making an allegation about a recent—
A.  Yeah.
Q.  —something that was recent?
A.  Yes. . . ."

11. Transcript of proceedings, January 14, 2003, Glenda Rodgers testifying in pertinent part at pp. 7–8:

"... Q. Okay. What did you do after that or what happened after that?
A.  Terminated in July of 2002. And then he came back on December the 16th of 2002, and I hadn't seen him since July and at that time, he told me that [the uncle] had pulled on his pee pee. . . .
Q.  Okay. What did you do at that point?
A.  We went to the play therapy room ... I told [the child], 'Let's pretend that the big doll is [the uncle],' and I showed him that he was anatomically correct. And I said, 'This little doll is [the child],' and I said, 'Why don't you show me what happened?' ...
And I said, 'Okay. Well, what was [the child] doing?' And he said, 'Well, he was there. He did this,' and he pulled the penis on [the child] doll. [sic] And I said, 'So who did that to [the child]?' And he said, '[The uncle] did that. He pulled my me pee like this.' ...."

12. Transcript of proceedings, January 14, 2003, Glenda Rodgers testifying in pertinent part:

at p. 15   "... Q. (By Mr. Schroeder) Going over—is there anything else that you can think of in your counseling session—sessions with Anthony that you've left out or that's important?
A.  I did. I forgot—whenever he was using the anatomically-correct dolls and he told me what happened, I asked him where that happened, if he was at somebody's house? And he said, 'No. It was in the bathroom.' And I said, 'Was it a bathroom at someone's

home?' And he said, 'No. It was at church. . . . . . "
at pp. 21–22   "... Q. Back on February the 13th—in these sessions you mentioned here about November or December, did the child tell you—give any time frame that anything happened?
A.  I did ask him—because of his age, it's very difficult for him to give—to make reference to time. He's not old enough to tell time. It's hard for him to understand a calendar and the concept of time. I asked him, in December, if he knew when it had happened and he said, 'When I was with my Daddy.' And I said, 'Was that over the weekend?' And he said 'When I was with my Daddy,' and that's all he would say. . . .
Q.  Okay. Could it have been a year before that or six months before that or—
A.  I don't think so. It seemed to be pretty recent. . . ."

13. Transcript of proceedings, January 14, 2003, Glenda Rodgers testifying in reference to the report issued by the Kansas SRS in pertinent part at p. 14:

"... Q. (By Mr. Schroeder) But if their claim is substantiated, you're saying that means it, more reasonably than not, probably happened?
A.  Well they give a definition here that says—
... THE WITNESS: It says, 'A report alleged of suspected child abuse or neglect is determined to be substantiated if there is enough evidence that a reasonable person could conclude that it did occur using the standard more likely than not.' ..."

14. Defendant's exhibit 2, written by Glenda Rodgers dated December 16, 2002, providing in pertinent part:

"... During the session, [the child] made allegation [sic] of molestation perpetrated by [the uncle] on a recent visit. I am by law required

a referral from the Oklahoma Department of Human Services on December 18, 2002.[15] Officer Doug Mabry (officer) interviewed a member of the father's church, the uncle, the father and the child. He also spoke with a member of the Kansas Police Department who received the initial report and advised the mother to file a formal complaint.

¶ 9 The church member indicated that the child had not attended services in over a year. The uncle stated that he had not seen the child since October of 2001, but that he was not surprised by the mother's allegations. He told the officer that he believed the mother had never liked him because of his race and because of a conflict which arose when the mother broke a lease and failed to pay rent money in a complex he managed.[16]

to report any suspected abuse of a child to SRS. After [the child's] session, I made a report to Stephanie McClure with the SRS office in El Dorado.... It is my suggestion that visitations with [the child's] father be discontinued until these allegations have been investigated. Should visitations continue, I will file a *Child in Need of Care* petition, to protect [the child] from further contact with [the uncle]. A *Child in Need of Care* petition could possibly result in [the child] being placed in SRS custody, removed from the home, and/or parental rights being severed should the investigation find you or your ex-husband have neglected to protect [the child] from continuing sexual molestation by [the uncle]...." [Emphasis in original.]

Rodgers had previously written a letter to a Kansas juvenile judge, evidently when the first abuse allegations were brought. She recounted her belief that the child had been molested and stated that she believed it would "be in the best interest" of the child to only have supervised visitation with the father until the allegations were investigated and there was some assurance that the child would not be left in the uncle's care. Defendant's exhibit 1.

15. Officer Mabry's report indicates that the abuse allegations involved incidents occurring in the summer or fall months of 2001. Defendant's exhibit 3, narrative report. However, this seems to be a typographical error in the date and should instead indicate a date of "2002". This would appear to be so because the referral did not occur until December of 2002, the narrative report shows Officer Mabry as having been assigned the case on December 12, 2002, and because interviews with the child were not conducted until February 3, 2003, according to the same narrative report.

The father reported that his son had not been around the uncle.

¶ 10 Initially, the officer made several attempts to contact the mother but he was unable to do so. On January 16, 2003, he was notified by a Kansas police officer that the mother had complained to the chief of police that, when he phoned her, the officer had been rude. Up to this point, the officer said he had never spoken with the mother but that he did reach her by phone following the notification from Kansas. In this conversation, he reported that the mother was belligerent and that she yelled and cussed at him until he just hung up on her.[17]

¶ 11 In an interview held on February 3, 2003, when the officer asked the child if he knew the uncle, he responded, "that's the

16. Defendant's exhibit 3, providing in pertinent part:

"... 12/23/2002—I called [the uncle] and asked him if he could come to the Police Department ... [The uncle] said that [the mother] never like him because she did not like black people. [The uncle] said that back in October of 2001 [the mother] made an allegation that he touched [the child] inappropriately.... [The uncle] said that ever since then he has just not been around [the child]..... He said that because of the bad relationship with [the mother] and because he knows how she can be, he just left it alone and didn't bother with it. [The uncle] said that [the mother] had even been a resident at Country Park Apartments, where he is the manager. He said that [the mother] skipped out on the lease and stills [sic] owe's [sic] some rent money...."

17. Defendant's exhibit 3, providing in pertinent part:

"... 01/16/2003—I was notified by Capt. Springstead that Chief Williams had gotten a complaint from [the mother] that she had spoken to me and that I was rude to her and that I laughed at her concerning this case. I have yet to talk to [the mother] up to this date. ... I called [the mother] after speaking to Capt. Springstead and she was home. I told her that I had been trying to get in touch with her. [The mother] became immediately belligerent.... [The mother] began yelling at me saying that the police officer lied and that she knows this happened because her son is 4 years old and children that young do not lie.... [The mother] began yelling louder and cussing. I told her that I was not going to listen to that and asked her to stop. She continued yelling and cussing so I ended the conversation by hanging up...."

man that touches my pee pee." [18] The child also told the officer and others present that when his uncle was touching his pee pee, he touched his own posterior, and that all this happened at the church.[19]

¶ 12 There is no question that the evidence presented at the hearing on March 28, 2003, was highly contested. The father insisted that the incident in November never occurred because his son did not see the uncle.[20] The uncle denied the abuse and stated that he had not seen his nephew since the divorce was granted. The mother testified the child detailed the incident at her niece's home and the mother's and the niece's stories were consistent.[21] The child's stepsister also reported that the child had told her that the uncle had put his hands in his pants and touched his pee pee at church.[22] The counselor was so convinced that the incident occurred and that it was recent that she filed a complaint with the Kansas SRS. The Kansas SRS found the report to be "substantiated". The counselor wrote to the mother advising her that if she didn't protect the child, her neglect would be reported, the child would be removed from her home, and that her custodial rights would be terminated.[23] Despite the child's indications in the interview, the officer testified that he believed neither that the child had been around the uncle nor that any inappropriate activity had occurred.[24] It appears that this conclusion was based, in part, on the fact that the child couldn't identify the uncle from a photo line-up.[25]

¶ 13 It is also apparent that, from the time of the divorce through the hearings involving the abuse allegations, the trial judge's patience had been stretched. He called the cause one of his "thorn-in-the-side cases" [26] and told the attorney for the mother

18. Defendant's exhibit 3, providing in pertinent part:

"... MABRY: Who is that? [referring to the uncle]
[THE CHILD]: That the—that's the man that touches my pee pee....
[THE CHILD]: He didn't do it on purpose.
MABRY: But do you remember when the last time you saw [the uncle] was?
... MABRY: When was it?
[THE CHILD]: Ah, that's because he just wanted to touch me pee pee....
MABRY: ... Where were you when it happened?
[THE CHILD]: Ah, he was at the Church (inaudible) all the people.
MABRY: (Inaudible) Where were you in the Church?
[THE CHILD]: Ah, well, I was going to the bathroom and I was—[the uncle] was touching me and now I got sick.
WILLSEY: Hmm.
[THE CHILD]: And he touched me on my pee pee...."

19. Defendant's exhibit 3, providing in pertinent part:

"... WILLSEY: Okay. So what part of [the uncle's] body did he touch?
... [THE CHILD]: Well, he touches his butt....
WILLSEY: ... And were where you when that happened?
[THE CHILD]: At the Church...."

20. See ¶ 5 and accompanying footnotes, supra.

21. *Id.*

22. Transcript of proceedings, March 28, 2003, Shannon Metz testifying in pertinent part at p. 87:

"... Q. Okay. What did [the child] tell you?
A. Well, he told me that someone had hurt him. And then later in the day, he went to the bathroom. When he come out, he told me that he had been at church and that [the uncle] had put his hands down his pants—
Q. Okay.
A. —and touched his pee pee...."

23. See ¶ 7 and accompanying footnotes, supra.

24. Transcript of proceedings, March 28, 2003, Officer Doug Mabry testifying in pertinent part at:

p. 6 "... Q. Okay, and what did you conclude from that interview?
A. There was no—it was inconclusive. He—[the child] could not or did not say that the incident occurred. Also, I presented [the child] with a photo lineup and he couldn't positively identify [the uncle]. There was just no evidence that he had been around [the uncle]...."
p. 8 "... Q. And based on all that you've done, you personally don't believe anything happened to this child?
... A. I would say that—I would say no. I don't think that any inappropriate behavior took place...."

25. See ¶ 12 and accompanying footnotes, supra.

26. Transcript of proceedings, March 28, 2003, providing in pertinent part at p. 64:

that he was "bored" with hearsay evidence offered by the mother sustaining his own, *sua sponte,* objection to it.[27] At the end of the hearing on March 28, 2003, the trial judge changed custody from the mother to the father, granting the mother standard visitation and ordering her to pay child support. Although he stated that he believed the child had been coached and that the mother had unduly influenced the police and social workers, out of an abundance of caution and to assuage the mother's concerns, the trial judge ordered—just as had he had done in the divorce decree—that the child was not to be around the uncle at any time.

¶ 14 On May 14, 2003, the mother appealed. A year later, the Court of Civil Appeals reversed stating that the mother had good cause for the temporary failure to allow paternal visitation during the course of the investigations in Kansas and Oklahoma and that there was no evidentiary support for the conclusion that she manipulated the child, social workers or the child's therapist. Furthermore, the appellate court held that there was no clear and convincing evidence of a permanent, substantial and material change of circumstances directly and adversely affecting the best interests of the child in such a way that the child would be substantially better off as to his temporal, moral or mental welfare if custody were given to the father.[28]

"... THE COURT: Yeah, I remember this case very well.
MR. HILL: Okay.
THE COURT: It's one [sic] my thorn-in-the-side cases...."

**27.** Transcript of proceedings, March 28, 2003, providing in pertinent party at p. 66:

"... THE COURT: I'm going [sic] sustain my own object to all this hearsay that's coming in. I'm getting really bored with it...."

**28.** When a change in custody is requested based on a change of circumstances, the parent asking for modification must establish: 1) a permanent, substantial and material change in circumstances; 2) the change in circumstances must adversely affect the best interests of the child; and 3) the temporal, moral and mental welfare of the child would be better off if custody is changed to the other parent. *Daniel v. Daniel,* 2001 OK 117, ¶ 17, 42 P.3d 863, *rehearing denied* (2002); *Fox v. Fox,* 1995 OK 87, ¶ 7, 904 P.2d 66, *as modified on rehearing* (1995); *Rice v. Rice,* 1979 OK 161, ¶ 8, 603 P.2d 1125.

Finally, it determined that the trial court's decision was against the clear weight of the evidence.[29] On June 16, 2004, the father filed his petition for certiorari. The mother filed motions for appellate attorney fees and to tax costs on June 17, 2004. On June 28th, the father responded to the two motions. We granted certiorari on October 21, 2004.

### I.

¶ 15 THE CLEAR, EXPLICIT, MANDATORY AND UNMISTAKABLE TERMS OF 43 O.S. SUPP.2003 § 112(D)(2) AUTHORIZE THE AWARD OF ATTORNEY FEES TO THE PREVAILING PARTY. THEREFORE, A PREVAILING PARENT, DEMONSTRATING GOOD CAUSE FOR WITHHOLDING COURT–ORDERED VISITATION, IS ENTITLED TO APPEAL–RELATED ATTORNEY FEES.

¶ 16 The mother asserts that, as the prevailing party, she is entitled to her appeal-related attorney fees under authority of 43 O.S. Supp.2003 § 112(D)(2).[30] Although the father agrees that the mother could seek attorney fees under the statute,[31] he argues that the mother is not entitled to recover because she did not act in the best interests

**29.** Unless a change in custody decision is found to be against the clear weight of the evidence, the appellate court indulges in the presumption that it is correct. *Carpenter v. Carpenter,* 1982 OK 38, ¶ 10, 645 P.2d 476.

**30.** Title 43 O.S. Supp.2003 § 112(D)(2), see note 2, supra.

**31.** Response to defendant/appellant's motion for attorney fees and motion to tax costs, filed on June 28, 2004, and providing in pertinent part:

"... That the Plaintiff/Appellee does not disagree that the Plaintiff/Appellant had the right to file this motion but that the statute referred to, 43 O.S. § 112 D2, refers to actions being brought contrary to the best interests of the child...."
Admissions in the brief may be regarded as a supplement to the appellate record. *Keating v. Edmondson,* 2001 OK 110, ¶ 9, 37 P.3d 882; *World Publishing Co. v. White,* 2001 OK 48, ¶ 19, 32 P.3d 835; *Oklahoma Urban Renewal Auth. v. Medical Technology & Research Auth. of Oklahoma,* 2000 OK 23, ¶ 14, 4 P.3d 677.

of their son either in withholding court-ordered visitation or in opposing the motion to modify. We disagree.

### A.

**¶ 17 THE POSSIBILITY THAT THE CHILD MAY HAVE BEEN SEXUALLY ABUSED, WHILE IN THE FATHER'S CUSTODY COUPLED WITH THE THREAT THAT HER PARENTAL RIGHTS MIGHT BE IN JEOPARDY IF SHE ALLOWED VISITATION DEMONSTRATE GOOD CAUSE FOR THE MOTHER'S WITHHOLDING VISITATION.**

■ ¶ 18 Title 43 O.S. Supp.2003 § 112(D)(1) [32] first became a part of Oklahoma's statutory law in 1999.[33] [Because the language referring to both the "good cause" showing and that addressing the award of attorney fees has remained unchanged since its addition in 1999, references are to the current statutory compilation.] It provides:

> "**Except for good cause shown,** a pattern of failure to allow court-ordered visitation may be determined to be contrary to the best interests of the child and as such may be grounds for modification of the child custody order." [Emphasis provided.]

Research reveals no case in which we have directly addressed the ramifications of the statute. Nevertheless, the statute specifically provides authority for a change of custody based on failure to allow court-ordered visitation. However, the statute also contains an exception—a **good cause** showing for interrupting visitation. "Good cause" is determined by application of equitable principles.[34]

¶ 19 If good cause was not exhibited here, it is difficult to fathom how a parent could demonstrate a well-founded reason for interrupting court-ordered visitation. Immediately following visitation with the father, the child spontaneously told his mother and her niece that he was fondling himself because his uncle stretched his pee pee.[35] The child's counselor came to the same conclusion after the child reported, in a subsequent play session, that his uncle had pulled on his pee pee.[36] Although the police officer conducting the investigation in Oklahoma did not believe there had been any contact with the uncle or that any abuse occurred, the determination contradicted the child's own statements to the officer that his uncle touched his pee pee.[37] The child's step-sister testified that the child told her that his uncle had put his hands down his pants and touched his pee pee.[38] The Kansas department equivalent to Oklahoma's Department of Human Resources found the child's claims to be substantiated [39] and the child's counselor threat-

---

**32.** Title 43 O.S. Supp.2003 § 112(D)(1), see note 2, supra.

**33.** Although other provisions of the statute were amended in 2003, the quoted language and the reference to attorney fees has been a part of the statutory language since 1999. As early as 1916, this Court recognized a change in custody was supported by an extreme case of visitation denial. In *Copeland v. Copeland*, 1916 OK 774, 159 P. 1122, the mother sought a change in custody after her children's paternal grandparents failed to allow her to visit with her children in private, as ordered by the trial court, and acted in a manner so as to poison the children's minds towards the mother. Here, it is abundantly clear that the relationship between the mother and the father is acrimonious. However, there is no evidence that the mother sought to alter the child's perception of his father. The only record evidence indicates that she interrupted visitation because of the child's exposure to the uncle, not because she sought to interfere in the relationship between her child and his father. See also, *Hoog v. Hoog*, 1969 OK 174, 460 P.2d 946, holding that an order changing custody of a minor child from the father, who had prevented proper communication between the child and its mother and whose second wife was in poor health, to the mother who had established a happy, well regulated home and a meaningful happy marriage with a second husband was not an abuse of discretion.

**34.** See, *Mason v. Ford*, 1923 OK 98, ¶ 0, 216 P. 129 providing:

> "... [T]he question of whether good cause to the contrary be shown ... must be determined upon the principle of comity, equity, and justice...."

**35.** See ¶ 5 and accompanying footnotes, supra.

**36.** See ¶ 6 and accompanying footnotes, supra.

**37.** See ¶ 11 and accompanying footnotes, supra.

**38.** See ¶ 12 and accompanying footnotes, supra.

**39.** See ¶ 7 and accompanying footnotes, supra.

ened to file a deprived action against the mother if she did not protect the child from the alleged abuse which could have resulted in the child being removed from her home and her parental rights being terminated. She could have suffered the same fate under Oklahoma law. In our state, a finding that a parent has sexually abused a child supports a termination of parental rights,[40] as well as the failure of a parent to protect a child from physical or sexual abuse.[41]

¶ 20 The mother was between the proverbial "rock and a hard place", a "Hobson's choice" or a "Wewoka Switch". There was a judicial order in place requiring the father to have visitation, but a counselor was threatening to have the child removed from her home and to have her parental rights terminated if she allowed the child to see his father. Furthermore, the child told his mother and several others that his uncle was abusive. The mother made what may have been a difficult legal choice—to follow the court order or to protect her parental rights, but which was probably not difficult emotionally—to protect her child from reported abusive behavior. The mother demonstrated good cause for withholding visitation. She faced the real possibility of the child's sexual abuse while visiting with his father and the threat of the child's counselor that she would be reported for failure to protect her child if she allowed visitation to continue which might result, not only in the removal of the child from her home, but the termination of her parental rights.

### B.

¶ 21 TITLE 43 O.S. SUPP.2003 § 112(D)(2) PROVIDES IN CLEAR, EXPLICIT, MANDATORY AND UNMISTAKABLE TERMS THAT WHEN AN ACTION IS BROUGHT UNDER THE STATUTE WHICH IS CONTRARY TO THE BEST INTERESTS OF THE CHILD, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER COURT COSTS, ATTORNEY FEES AND ANY OTHER COSTS AND EXPENSES INCURRED IN THE ACTION.

¶ 22 In determining whether a statute applies to a given set of facts, we focus on legislative intent[42] which controls statutory interpretation. Intent is ascertained from the whole act in light of its general purpose and objective[43] considering relevant provisions together to give full force and effect to each.[44] When a special statute clearly includes the matter in controversy, the special statute controls over a statute of general applicability.[45] The Court presumes that the Legislature expressed its intent and that it intended what it expressed.[46] Statutes are interpreted to attain that purpose and end[47] championing the broad public poli-

**40.** *Matter of D.D.F. & S.D.F.*, 1990 OK 89, ¶ 23, 801 P.2d 703.

**41.** Title 10 O.S.2001 § 7006–1.1 provides in pertinent part:
"A.... [A] court may terminate the rights of a parent to a child in the following situations ... 10. A finding in a deprived child action either that:
a. The parent has physically or sexually abused the child or a sibling of such child or failed to protect the child or a sibling of such child from physical or sexual abuse that is heinous or shocking to the court ..."
*Matter of T.R.W.*, 1985 OK 99, ¶¶ 15 and 17, 722 P.2d 1197.

**42.** *Tulsa County Budget Bd. v. Tulsa County Excise Bd.*, see note 3 at ¶ 12, supra; *Nealis v. Baird*, 1999 OK 98, ¶ 55, 996 P.2d 438, *rehearing denied* (2000); *Cooper v. State ex rel. Dept. of Public Safety*, 1996 OK 49, ¶ 10, 917 P.2d 466.

**43.** *Keating v. Edmondson*, see note 3 at ¶ 8, supra; *McSorley v. Hertz Corp.*, 1994 OK 120, ¶ 6,

885 P.2d 1343; *Oglesby v. Liberty Mut. Ins. Co.*, 1992 OK 61, ¶ 8, 832 P.2d 834.

**44.** *Haney v. State*, 1993 OK 41, ¶ 5, 850 P.2d 1087; *Public Serv. Co. of Oklahoma v. State ex rel. Corp. Comm'n*, 1992 OK 153, ¶ 8, 842 P.2d 750.

**45.** *Davis v. GHS Health Maintenance*, 2001 OK 3, ¶ 10, 22 P.3d 1204; *Tulsa County Deputy Sheriff's Fraternal Order of Police, Lodge No. 188 v. Board of County Comm'rs of Tulsa County*, 1998 OK 44, ¶ 13, 959 P.2d 979; *Carter v. City of Oklahoma City*, 1993 OK 134, ¶ 11, 862 P.2d 77.

**46.** *Minie v. Hudson*, see note 3, supra; *Fuller v. Odom*, 1987 OK 64, ¶ 4, 741 P.2d 449; *Darnell v. Chrysler Corp.*, 1984 OK 57, ¶ 5, 687 P.2d 132.

**47.** *Oklahoma Ass'n for Equitable Taxation v. City of Oklahoma City*, 1995 OK 62, ¶ 5, 901 P.2d 800, *rehearing denied* (1995), *cert. denied*, 516 U.S. 1029, 116 S.Ct. 674, 133 L.Ed.2d 523 (1995);

cy purposes underlying them.[48] Only where the legislative intent cannot be ascertained from the statutory language, i.e. in cases of ambiguity or conflict, are rules of statutory construction employed.[49]

¶ 23 The award of court costs, attorney fees and other reasonable costs and expenses incurred in an action involving failure to allow court-ordered visitation is specifically addressed in 43 O.S. Supp.2003 § 112(D)(2). The statute provides:

> "For any action brought pursuant to the provisions of this section which the court determines to be contrary to the best interests of the child, the prevailing party **shall** be entitled to recover court costs, attorney fees and any other reasonable costs and expenses incurred with the action." [Emphasis supplied.]

In clear, explicit, mandatory [50] and unmistakable terms, the Legislature states that in any action brought pursuant to the statute which is contrary to the best interests of the child, the prevailing party **shall** be entitled to recover court costs, attorney fees and other reasonable costs and expenses incurred in the cause.

¶ 24 The father presented no evidence that the mother was unfit as a custodial parent or that the interrupted visitation had damaged his relationship with his son. Although he denied that he had allowed the child to see the uncle, the father did not call the uncle to testify as to whether he had been in the child's presence in violation of the divorce decree or any other witness on this issue. The father chose to rely on the officer's determination that the child had not seen the uncle or been abused. This finding

is unconvincing when the child's statements before the officer and the conclusions drawn by all of the other professionals involved are considered. Furthermore, he neither took his son to a counselor nor called an expert to testify on his behalf.

¶ 25 The mother presented evidence that it would be against the child's best interests to be placed in his father's custody. She called four witnesses who all testified that the child reported the abuse with two of those witnesses believing that the abuse had occurred in recent visitation settings.

¶ 26 The father filed the action, the mother presented evidence of good cause for denying the visitation and presented sufficient evidence to rebut any argument that a change of custody was in the child's best interest. She is a prevailing party [51] entitled to recover attorney fees and costs under the clear, explicit, mandatory and unmistakable terms of 43 O.S. Supp.2003 § 112(D)(2).[52]

### C.

¶ 27 TITLE 43 O.S. SUPP.2003 § 112(D)(2) AUTHORIZES THE AWARD OF ATTORNEY FEES TO THE PREVAILING PARTY. WHERE THERE IS AUTHORITY FOR SUCH AN AWARD IN THE TRIAL COURT, SIMILAR FEES ARE ALLOWABLE ON APPEAL. THEREFORE, THE MOTHER IS ENTITLED TO APPEAL–RELATED ATTORNEY FEES AS THE PREVAILING PARTY.

■ ¶ 28 The original right to appeal-related attorney fees is established in the

*Wilson v. State of Oklahoma ex rel. Oklahoma Tax Comm'n*, 1979 OK 62, ¶ 5, 594 P.2d 1210; *Affiliated Mgt. Corp. v. Oklahoma Tax Comm'n*, 1977 OK 183, 570 P.2d 335.

48. *Haggard v. Haggard*, 1998 OK 124, ¶ 1, 975 P.2d 439; *Price v. Southwestern Bell Tel. Co.*, 1991 OK 50, ¶ 7, 812 P.2d 1355.

49. *State ex rel. Dept. of Human Serv. v. Colclazier*, 1997 OK 134, ¶ 9, 950 P.2d 824; *Matter of Estate of Flowers*, 1993 OK 19, ¶ 11, 848 P.2d 1146.

50. Generally, when the Legislature uses the term "shall", it signifies a mandatory directive or

command. *Tulsa County Budget Bd. v. Tulsa County Excise Bd.*, see note 3, supra; *Keating v. Edmondson*, see note 3, supra; *United States through Farmers Home Admin. v. Hobbs*, see note 3, supra. Nevertheless, the term can be used permissively, *Minie v. Hudson*, see note 3, supra; *Texaco, Inc. v. City of Oklahoma City*, see note 3, supra.

51. A prevailing party is one in whose favor judgment is rendered. See, *Associates Financial Serv. v. Millsap*, 1977 OK 157, ¶ 8, 570 P.2d 323.

52. Title 43 O.S. Supp.2003 § 112(D)(2), see note 2, supra.

appellate court.[53]  These fees are recoverable if statutory authority exists for their award in the trial court.[54]  Title 43 O.S. Supp.2003 § 112(D)(2)[55] unambiguously provides that the prevailing party shall be allowed attorney fees.  The mother successfully defended the modification.  She is the prevailing party entitled to recover for legal services rendered on appeal.

## II.

¶29  **THE BALANCING OF JUDICIAL EQUITIES SUPPORTS AN AWARD OF APPEAL–RELATED ATTORNEY FEES TO THE MOTHER.**

■■■  ¶30  In Oklahoma, neither the nonprevailing party in a matrimonial case nor the principal spousal provider is under a duty to pay counsel fees.  Rather, counsel-fee allowances are granted only to the litigant who qualifies for the benefit through the process of a judicial balancing of the equities.[56]  This Court determines the right for appellate attorney fees in matrimonial litigation.[57]

■■  ¶31  It does not appear that the mother sought attorney fees in the trial court, but she requests the fees on appeal.[58]  Based on the record, there are compelling and overriding equitable considerations in favor of the mother.  When the decree was entered the trial court must have believed it was in the best interests of the child to be with the mother or she would not have been awarded custody.[59]  There was no evidence presented in the modification proceedings indicating that she was unfit.  Because of the father's filing of the motion to modify, the mother was required to employ counsel to defend in the trial court and to file her appeal.[60]  Undoubtedly, she also found it necessary to employ a professional witness, the child's counselor, to appear on her behalf.  After having lost in the trial court, the mother was forced to either allow the ordered custody change or to pay her counsel for the additional representation.

¶32  The hours billed and set forth in the application for appellate attorney fees appear reasonable.[61]  The equities support an award

**53.**  *GRP of Texas, Inc. v. Eateries, Inc.,* 2001 OK 53, ¶6, 27 P.3d 95; *Chamberlin v. Chamberlin,* 1986 OK 30, ¶14, 720 P.2d 721.

**54.**  *Daniel v. Daniel,* see note 28 at ¶21, supra; *Goodwin v. Durant Bank & Trust Co.,* 1998 OK 3, ¶10, 952 P.2d 41; *McCormack v. Town of Granite,* 1996 OK 19, ¶6, 913 P.2d 282; *Sisney v. Smalley,* 1984 OK 70, ¶20, 690 P.2d 1048.

**55.**  Title 43 O.S. Supp.2003 § 112(D)(2), see note 2, supra.

**56.**  *Larman v. Larman,* 1999 OK 83, ¶20, 991 P.2d 536, *as corrected* (1999); *Thielenhaus v. Thielenhaus,* 1995 OK 5, ¶19, 890 P.2d 925; *Harmon v. Harmon,* 1983 OK 89, ¶19, 770 P.2d 1; *Phillips v. Phillips,* 1976 OK 165, ¶10, 556 P.2d 607.  Title 43 O.S. Supp.2003 § 110 provides in pertinent part:

"... D. Upon granting a decree of dissolution of marriage, annulment of a marriage, or legal separation, the court may require either party to pay such reasonable expenses of the other as may be just and proper under the circumstances.
E.  The court may in its discretion make additional orders relative to the expenses of any such subsequent actions, including but not limited to writs of habeas corpus, brought by the parties or their attorneys, for the enforcement or modification of any interlocutory or final orders in the dissolution of marriage action

made for the benefit of either party or their respective attorneys."

**57.**  *Daniel v. Daniel,* see note 28, supra; *Chamberlin v. Chamberlin,* see note 53, supra.

**58.**  See, *Eby v. Eby,* 1959 OK 255, ¶14, 347 P.2d 1036.

**59.**  See, *Pirrong v. Pirrong,* 1976 OK 36, ¶10, 552 P.2d 383.

**60.**  Such a scenario has been justified for an allowance of attorney fees in a matrimonial cause.  *Jones v. Jones,* 1961 OK 236, ¶0, 365 P.2d 1019; *Howard v. Howard,* 1958 OK 224, ¶0, 331 P.2d 946.

**61.**  The total hourly fee request is twenty-one hours.  The hourly breakout is outlined as follows: 1) writing petition in error, summary on petition in error, designation of record in district court, district court filing in McClain County—2 hours; 2) travel and filing to and from Supreme Court—1.5 hours; 3) writing brief-in-chief, researching case law & statutory law on Westlaw—2 hours; 4) reviewing and rewriting brief-in-chief—3 hours; 5) travel and filing to and from Supreme Court—1.5 hours; and 5) reading and reviewing response brief, writing reply brief, reviewing and rewriting response brief—2.0 hours.  See, motion for attorney's fees on appeal, filed on June 17, 2004.

to the mother. The cause is remanded for the trial court to determine the amount of appellate attorney fees allowable.[62]

## CONCLUSION

¶ 33 There is no question that the divorce proceeding and the modification action have been contentious and time consuming for both the parties and the trial court. Neither the mother nor the father are completely without fault in the way matters have been handled. The litigation has been troublesome and extensive. Certainly, the trial court and the attorneys feel as though they have exercised "the patience of Job".[63] The trial court's statements indicate a high level of frustration with the mother.[64] Nevertheless, even if the mother's actions were contemptuous, such a finding, in and of itself, is insufficient to support a custody change.[65] The mother made a choice in halting visitation—to protect her child from alleged abuse and her own custodial and parental rights rather than face the possibility the child might be sexually molested or her rights terminated.

¶ 34 The clear and convincing evidence of the real possibility that her son had been sexually abused, when in the father's custody, was good cause for the mother to withhold visitation coupled with the counselor's threat to report her to Kansas child welfare officials. Title 43 O.S. Supp.2003 § 112(D)(2) [66] is not the least bit ambiguous. It provides in clear, explicit, mandatory and unmistakable terms that when an action is brought under the statute which is contrary to the best interests of the child, the prevailing party shall be entitled to recover court costs, attorney fees and any other costs and expenses incurred in the action. Where there is statutory authority for an award of attorney fees in the trial court, similar fees are allowable on appeal.[67] Therefore, we hold that, as the prevailing party, the mother is entitled to appeal-related attorney fees. Even if there were no statutory authority for the award, a balancing of the judicial equities would weigh in the mother's favor allowing the award. Furthermore, we leave the Court of Civil Appeals opinion undisturbed.

**CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS OPINION LEFT UNDISTURBED; TRIAL COURT REVERSED AND REMANDED.**

WATT, C.J., WINCHESTER, V.C.J., LAVENDER, HARGRAVE, KAUGER, EDMONDSON, TAYLOR, COLBERT, J.J. concur.

OPALA, J. dissents.

OPALA, J., dissenting.

¶ 1 The court's opinion **reaches for decision** Mother's post-appeal plea for an appeal-related attorney's fee **but denies Father's certiorari quest** for corrective relief, which **leaves undisturbed** the Court of Civil Appeals' [COCA] **reversal** of Father's nisi prius change-of-custody victory. The court holds today (a) a parent demonstrating at nisi prius good cause for withholding visitation is entitled by the terms of 43 O.S.Supp.2003 § 112(D)(2) [1] to an appeal-related counsel-fee award; (b) Mother is to be declared the prevailing party in the trial court because there is **record proof on appeal** of her good cause for denying Father's visitation and **sufficient evidence** to rebut any argument that a change of custody was in the child's best interest; and (c) even if there were no statutory authority for a prevailing-party award to Mother, a balancing of the equities also would support today's appeal-related counsel-fee award to her. The court opines the

---

**62.** See, *Roemer v. Roemer,* 1962 OK 166, ¶ 18, 373 P.2d 55.

**63.** *Warr v. Warr,* 1963 OK 185, ¶ 11, 386 P.2d 639.

**64.** See, ¶ 13 and accompanying footnotes, supra.

**65.** *Pirrong v. Pirrong,* see note 59, supra; *Young v. Young,* 1963 OK 14, ¶ 0, 383 P.2d 211.

**66.** Title 43 O.S. Supp.2003 § 112(D)(2), see note 2, supra.

**67.** *Daniel v. Daniel,* see note 28, supra; *Goodwin v. Durant Bank & Trust Co.,* see note 54, supra; *McCormack v. Town of Granite,* see note 54, supra; *Sisney v. Smalley,* see note 54, supra.

**1.** For the pertinent terms of 43 O.S.Supp.2003 § 112(D)(2), see *infra* note 14.

hours billed for Mother's legal services appear reasonable and remands the cause for the **sole purpose of determining the amount** of allowable appeal-related counsel fee. **Its pronouncement does not address Mother's motion for court costs in the appellate courts. I dissent from the court's opinion.**

¶ 2 When, as here, there is neither an earlier nisi prius counsel-fee award nor one directed to be made by COCA, a party's quest for an appeal-related attorney's fee **must never** be allowed as a **permissible post-appeal addendum** to the review process, but should rather be regarded **as pressing for supplemental recovery.** To put it in more simple terms, Mother's post-appeal fee quest is plainly an attempt **to enlarge her recovery beyond that granted by both the trial court and COCA. Mother sought no certiorari review.** More importantly, her plea for an enlarged supplemental post-appeal recovery **calls for an adversarial evidentiary hearing** to determine whether, upon COCA's reversal of Father's trial-court victory, Mother's appellate success may be brought within the purview of § 112(D)(2). Because there was here **no antecedent COCA-affirmed counsel-fee award** for trial-court services in a proceeding in which Father stood declared a vanquished litigant, this court **should not today decide Mother's entitlement to a fee award by making initial findings of fact** in a fact-intensive dispute never before pressed for nisi prius resolution. **Due process requires here a post-remand evidentiary hearing at which Father would be afforded full opportunity to defend against the imposition of counsel fee by showing that the invoked statute does not apply in the factual context of the litigation actually waged.** No less than this opportunity—one never afforded him before—is Father's constitutional due.

¶ 3 If I were writing for the court I would **retransfer** to COCA Mother's motion

for an appeal-related attorney's fee. As her plea for post-appeal relief, that motion was **timely filed and correctly addressed for** COCA's consideration. I would also direct that before proceeding to consider the fee quest, COCA make a referral of the controversy to the trial judge, to sit as a special master, for a decision on several unresolved fact and law issues which could then be reviewed (by COCA) under a *de novo* standard. In the alternative, **I would declare** Mother's fee motion to be the functional equivalent of her timely rehearing petition which extends COCA's power over the case until the rehearing's disposition **and would treat** Father's certiorari petition as curable for its premature filing. My solution, which would allow the parties to litigate their fee controversy in a forum best equipped to afford them an adversarial evidentiary hearing, is not only inherently fair but also required by the minimum standards of federal and state due process.

## I

### MOTHER'S APPEAL–RELATED FEE ENTITLEMENT SHOULD NOT BE DECIDED BY THIS COURT

#### A.

*In The Absence Of A Timely Certiorari Petition This Court Is Without Cognizance To Address Mother's Counsel–Fee Quest*

¶ 4 One's entitlement to a counsel fee as prevailing party gives a litigant **an added element of postjudgment recovery.** The victorious party's statutorily authorized fee award **"creates and enlarges substantive rights"** in an action.[2] Any fee recovery beyond that which stands expressly granted by COCA (or by the trial court) cannot be enhanced by the Supreme Court **without its antecedent assumption of certiorari jurisdiction upon the fee seeker's petition.**[3]

---

**2.** *Thomas v. Cumberland Operating Co.*, 1977 OK 164, 569 P.2d 974, 976–77.

**3.** A timely petition for certiorari is one that has been filed with the Supreme Court Clerk within 20 days of the filing of the Court of Civil Appeals'

opinion. The pertinent terms of Rule 1.179(e), Supreme Court Rules, 12 O.S.2001, App. 1, are:
  (e) Time to File Petition.
  When no party seeks rehearing in the Court of Civil Appeals a petition will be deemed timely if filed with the clerk of the Supreme Court **within twenty (20) days of the date the opin-**

¶ 5 The *Hough v. Leonard*[4] analysis is not invocable to confer here cognizance upon this court without Mother's timely certiorari petition. *Hough* saves for *sua sponte* review—one that can be conducted *sans* certiorari quest—only those issues which, though **properly raised and briefed on appeal, were left unaddressed by COCA.**[5] *Hough* does not teach that a certiorari party may, without pressing its own counter-petition, seek to enlarge its rights to any relief not granted by COCA. **A certiorari party who brings no counter-petition of its own stands in a posture restricted to defending against loss of relief secured on appeal.**[6]

¶ 6 Mother was the vanquished litigant at nisi prius where custody of her child was transferred to the husband. While both parties' district-court paperwork **requested** a trial-related attorney's fee,[7] neither litigant **pressed** for this relief either at the end of the there-conducted modification hearings or before COCA's pronouncement. The nisi prius order tendered for review on appeal is entirely silent on the fee issue. Neither did either party press during the appeal for an appeal-related counsel fee. **That issue was first raised by Mother's post-appeal motion addressed to COCA.** Although Mother may indeed be entitled to an appeal-related counsel fee, **in the absence of a timely certiorari petition of her own, this court is without cognizance**[8] **to grant her relief not won in COCA's opinion.**[9]

¶ 7 In short, in the absence of certiorari cognizance **conferred by her timely petition,** I would not grant here to Mother a recovery beyond that she won from COCA.

## B.

### *The Nature Of Mother's Post–Appeal Relief Plea Calls Not For An Addendum But For An Enlarged Supplemental Recovery*

¶ 8 Recovery that amounts to a mere post-appeal **addendum** is to be distinguished from that which requires **initial resolution**

---

ion was filed by the Court of Civil Appeals. When a party sought rehearing a petition for certiorari will be deemed timely if filed with the clerk of the Supreme Court **within twenty (20) days of the date the order** of the Court of Civil Appeals is filed **that has denied all timely filed rehearing petitions.** The time to file petition for certiorari shall not be extended. A petition for certiorari will be deemed filed when mailed if it complies with Rule 1.4(c) and (e).
(emphasis added).
This court is duty-bound to inquire *sua sponte* into its own jurisdiction over any pending matter. *Stites v. DUIT Const. Co., Inc.*, 1995 OK 69, 903 P.2d 293, 297 n. 10; *State ex rel. Oklahoma Bar Ass'n v. Smolen*, 1992 OK 116, 837 P.2d 894, 903 (Opala, C.J., concurring); *Cate v. Archon Oil Co., Inc.*, 1985 OK 15, 695 P.2d 1352, 1356; *Spain v. Kernell*, 1983 OK 105, 672 P.2d 1162, 1164–1165; *Pointer v. Hill*, 1975 OK 73, 536 P.2d 358, 361.

4. 1993 OK 112, 867 P.2d 438.

5. *Id.* at ¶ 18, at 446.

6. The law has never permitted one who has not timely appealed, counter- or cross-appealed, to advance for review any reversible error. *State v. County Beverage License No. ABL–78–145*, 1982 OK 114, ¶¶ 12–13, 652 P.2d 292, 294–95; *May v. May*, 1979 OK 82, ¶ 12, 596 P.2d 536, 540; *Woolfolk v. Semrod*, 1960 OK 98, ¶ 12, 351 P.2d 742, 745 (a successful party may, without a counter- or cross-appeal, argue before an appellate court only those errors which, if rectified, would support the correctness of the trial court's judgment); *Holshouser v. Holshouser*, 1933 OK 554, ¶ 0 syl.2, 166 Okl. 45, 26 P.2d 189 (parties who fail to appeal "can demand no relief from the appellate tribunal"); *Sharum v. City of Muskogee*, 1914 OK 191, ¶ 0 syl.1, 43 Okl. 22, 141 P. 22. As far back as 1915 we distinguished between relief that can be granted by motion and relief that must be sought by a counter-appeal. *Bruner v. Eaton*, 1926 OK 655, ¶ 0 syl., 121 Okl. 209, 249 P. 734; *Spaulding v. Beidleman*, 1915 OK 774, ¶ 0 syl., 49 Okl. 197, 152 P. 367.

7. Father's motion for modification and Mother's answer both requested an attorney's fee. The parties did not press for this recovery at the 14 January 2003 and 28 March 2003 hearings.

8. Jurisdiction of an appellate tribunal is conferred either by timely petition in error or timely certiorari petition. *Woolfolk, supra* note 6 at 745.

9. *See, e.g., State ex rel. Dept. of Transportation v. Little*, 2004 OK 74, ¶ 26, 100 P.3d 707, 721. In *Little* the trial court awarded relocation expenses to the landowners/condemnees. COCA remanded the cause for reduction of moving expenses in the nisi prius award. Although this court held that the reduction was improper, because landowners failed to file a timely certiorari petition, their recovery was reduced to the amount erroneously declared by COCA.

of one's right to recover. Addendum means that which "should be added." [10] It is based on the principle that if a party is entitled to a counsel fee as prevailing party in the trial court, it is also entitled to an attorney's fee on appeal.[11] When COCA **affirms a nisi prius fee award,** the victor's recovery for appeal-related services should be regarded as a **mere** *ex lege* **addendum** that does not call for certiorari to secure in this court. The affirmance of the fee award *ipso facto* authorizes the **requested** appeal-related attorney's fee to be added to the victor's trial-court recovery.

¶ 9   Because there is here **no underlying COCA or nisi prius counsel-fee award** to Mother, her quest for an appeal-related attorney's fee cannot be treated **as a mere addendum.** Instead, it must be regarded **as one for an enlarged supplemental recovery**—one that went judicially unresolved by being absent from appellate pleas for relief. **This court is clearly without power to reach for decision a post-appeal quest for enhancement of one's trial- and appellate-court recovery** *sans* **timely-conferred certiorari cognizance.**

¶ 10   Today's analysis—which leads me to conclude the fee quest does not call for a mere post-appeal addendum but rather for enhanced supplemental recovery—raises a first-impression question. Were it not for a **procedural alternative** [12]—beneficial to Mother—which would allow consideration of her plea for enlarged supplemental recovery, I would declare here that the distinction between addendum and supplemental recovery should be applied only prospectively [13] and deny Mother's post-appeal plea.

### C.

*The Court Allows A Counsel-fee Award By Making Initial Fact Findings And Without Affording Both Parties The Benefit Of Due Process By A Nisi Prius Adversarial Evidentiary Hearing To Determine Whether Mother's Fee Quest Meets The Standards Of 43 O.S.Supp.2003 § 112(D)(2).*[14]

¶ 11   Mother's fee quest calls for an evidentiary hearing to determine if the trial-court proceeding may be brought within the purview of § 112(D)(2)—that is, whether Father's conduct contributed to the scenario (which necessitated the re-adjudication of visitation) either by his neglect or willingness to

10.  The term "addendum" is defined as "a thing that is added or is to be added." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 24 (1961). According to BLACK'S the term means "[s]omething to be added, esp. to a document; a supplement." BLACK'S LAW DICTIONARY 38 (7th ed.1999).

11.  Where, as here, there is statutory authority to allow an attorney's fee at the trial level, additional fees may be assessed for legal services rendered in an appellate court. *Hough v. Hough,* 2004 OK 45, ¶ 13, 92 P.3d 695, 702; *Baptist Medical Center of Oklahoma, Inc. v. Aguirre,* 1996 OK 133, ¶ 13, 930 P.2d 213, 219–20; *Sisney v. Smalley,* 1984 OK 70, ¶ 20, 690 P.2d 1048, 1051; *Moses v. Hoebel,* 1982 OK 26, ¶ 5, 646 P.2d 601, 603 (under the American rule that is followed in Oklahoma, attorney's fees are not ordinarily allowed unless their recovery is authorized by statute or contract).

12.  For a discussion of the procedural alternatives to certiorari, see Part II *infra.*

13.  *McDaneld v. Lynn Hickey Dodge, Inc.,* 1999 OK 30, ¶ 12, 979 P.2d 252, 257. Judicial policy determines whether, and to what extent, a new rule will operate retroactively. *Griggs v. State ex rel. Oklahoma Dept. of Transp.,* 1985 OK 51, ¶ 11, 702 P.2d 1017, 1020. For extant jurisprudence giving purely prospective effect to the court's pronouncement, see *Hale v. Bd. of Cty. Com'rs of Seminole County,* 1979 OK 158, ¶ 4, 603 P.2d 761, 764; *Isbell v. State, Etc.,* 1979 OK 156, ¶ 1, 603 P.2d 758, 760–61 (Opala, J., concurring); *Poafpybitty v. Skelly Oil Company,* 1964 OK 162, ¶ 19, 394 P.2d 515, 520 (the court applied prospectively its pronouncement on whether errors of law may be saved for review by their inclusion in an unnecessary motion for new trial).

14.  The terms of 43 O.S.Supp.2003 § 112(D)(2) are:

> D.  1.  Except for good cause shown, a pattern of failure to allow court-ordered visitation may be determined to be **contrary to the best interests of the child** and as such may be grounds for modification of the child custody order.
> 2.  For any action brought pursuant to the provisions of this section which the court determines to be **contrary to the best interests of the child,** the **prevailing party shall be entitled to recover** court costs, **attorney fees** and any other reasonable costs and expenses incurred with the action.

(emphasis added).

expose the child to a molesting uncle. **A hearing on that critical fee liability issue was never held in the trial court. There Father was the victorious party.**

¶ 12 Appellate courts cannot make first-instance determinations of either law or fact.[15] That is the trial court's function in every case.[16] In the absence of a nisi prius declaration of Father's status—*qua* vanquished litigant subject to imposition of a § 112(D)(2) fee award—**the mandatory critical fee inquiry cannot be concluded by the Supreme Court's initial fact findings.**[17] In sum, this court must not here exercise first-instance cognizance by determining Mother's right to **an enlargement of recovery** as prevailing party. The issue of her entitlement

was neither resolved at nisi prius nor determined by COCA on appeal.

¶ 13 Absent an antecedent nisi prius hearing on Mother's fee quest, today's decision denies to Father the opportunity to defend against his counsel-fee liability by showing that in the context of the waged forensic combat the invoked statute does not apply. Due process requires an orderly proceeding in which the parties are given "an opportunity to be heard, and to defend, enforce and protect their rights."[18] **Father in this case is clearly entitled to be heard in a forum which may conduct an adversarial evidentiary hearing.**[19]

¶ 14 This court should not determine Mother's fee entitlement for yet another reason. **Father's response to Mother's post-**

**15.** It is not the function of this court to make first-instance determinations of fact or legal questions which have been properly presented to the trial court but left unresolved or which have been neither raised nor assessed at nisi prius. *Evers v. FSF Overlake Associates*, 2003 OK 53, ¶ 18, 77 P.3d 581, 587; *Salazar v. City of Okla. City*, 1999 OK 20, ¶ 15, 976 P.2d 1056, 1062; *Bivins v. State of Okla. ex rel. Okla. Memorial Hosp.*, 1996 OK 5, ¶ 19, 917 P.2d 456, 464; *Dyke v. St. Francis Hosp., Inc.*, 1993 OK 114, ¶ 11, 861 P.2d 295, 300; *Davis v. Gwaltney*, 1955 OK 362, ¶ 13, 291 P.2d 820, 824.

It is a familiar rule of the common law, respected in the Anglo–American system, that appellate courts will not make initial (original) findings of fact by a *de novo* review of factual matters that were before the trial court. *Ohio v. Wyandotte Chems. Corp.*, 401 U.S. 493, 498, 91 S.Ct. 1005, 1009, 28 L.Ed.2d 256 (1971). Initial appellate factfinding deprives the process of a critical common-law ingredient which calls for judicial fact-findings to be drawn from living (*viva voce*) testimony. A trial judge has that opportunity but it is not available to an appellate court (from an examination of a cold record). The former may observe the demeanor and conduct of the witnesses as an invaluable aid for assessment of their credibility. *In re Estate of Holcomb*, 2002 OK 90, ¶ 8, 63 P.3d 9, 13.

**16.** When necessary findings of fact and conclusions of law are absent from a record, the case must be remanded with directions that they be made by the trial court. *Toxic Waste Impact Group, Inc. v. Leavitt*, 1994 OK 148, ¶ 15, 890 P.2d 906, 913; *Dyke, supra* note 15 at ¶ 11 n. 13, at 300; *Matter of Estate of Pope*, 1990 OK 125, ¶ 2 n. 6, 808 P.2d 640, 642; *Robert L. Wheeler, Inc. v. Scott*, 1989 OK 106, ¶ 21, 777 P.2d 394, 399; *Davis, supra* note 15, at ¶ 13, at 824. There is some federal circuit jurisprudence which is criticized for transgressing that borderline. *See, e.g., Pullman–Standard v. Swint*, 456 U.S. 273,

291–92, 102 S.Ct. 1781, 1792, 72 L.Ed.2d 66 (1982), and *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986), where the Court chided the circuit court for making its own factfindings on matters not reached by the district court rather than remanding the cause for further factfinding at first instance. In *Pullman–Standard*, the Court observed that:

"When an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings:

"[F]actfinding is the basic responsibility of district courts, rather than appellate courts, and ... the Court of Appeals should not have resolved in the first instance this factual dispute which had not been considered by the District Court." *DeMarco v. United States*, 415 U.S. 449, 450, n., 94 S.Ct. 1185, 1186, n., 39 L.Ed.2d 501 (1974)

*Id.* at 291–92, at 1792.

**17.** *See supra* notes 15 and 16.

**18.** Federal constitutional jurisprudence teaches that an opportunity to be heard is an essential element of due process. *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798, 103 S.Ct. 2706, 2711, 77 L.Ed.2d 180 (1983). As the Constitution inexorably commands, no one's rights may be adversely affected in the absence of due and timely notice that **affords a full and fair opportunity to defend.** *Id.; Booth v. McKnight*, 2003 OK 49, ¶¶ 18, 20, 70 P.3d 855, 862–63; *Shamblin v. Beasley*, 1998 OK 88, ¶ 12, 967 P.2d 1200, 1209.

**19.** *Id.*

appeal fee quest vigorously urges that the fee provisions of the invoked statute do not apply to him.[20] In effect, he argues that Mother's fee plea can be reached for decision only in an adversarial evidentiary hearing. That fee calls for a fact-intensive inquiry. He presses an objection against appellate fee imposition based solely upon a nisi prius transcript. The fee liability clearly presents an issue no appellate court should initially decide.

### D.

*Unlike A Counsel–Fee Quest, Which Calls Here For Nisi Prius Adjudication, Taxation Of Court Costs Triggers Only Ministerial Process.*

¶ 15 An attorney's fee is a rubric different from court costs. A counsel-fee quest sought as an element of recovery **triggers the adjudicative process.** It requires an **adversarial evidentiary hearing on the right of recovery** [21] **as well as its amount.**[22] In contrast, costs are not part of recovery. A motion for court costs imposes on the court clerk the ministerial function of taxing ordinary costs **without antecedent judicial action** or a party's request. When a COCA opinion is silent as to costs and there is no post-decisional order dealing with this item, costs are allowed "of course" (*de cursu*) by the appellate court clerk to the prevailing party.[23]

---

20. First, he argues that it is the nisi prius court that has the authority to award counsel fees based on the statutory "best interests of the child" standard. Next, he claims that the terms of the invoked statute do not apply to him.

21. While generally the right to a counsel-fee award presents an issue of law (see in this connection *Hawzipta v. Ind. School Dist. No. I–004 of Noble Co.*, 2000 OK CIV APP 113, ¶ 26, 13 P.3d 98), when critical facts are disputed and a hearing sought, an adversarial inquiry is the party's due.

22. *Oliver's Sports Center, Inc. v. Nat'l Standard Ins. Co.*, 1980 OK 120, ¶ 8, 615 P.2d 291, 295; *State ex rel. Burk v. City of Oklahoma City*, 1979 OK 115, ¶ 20, 598 P.2d 659, 663.

23. *Chamberlin v. Chamberlin*, 1986 OK 30, ¶ 11, 720 P.2d 721, 726.

24. 12 O.S.2001 § 978; *Chamberlin, supra* note 23, at ¶ 11, at 726.

¶ 16 Because **court costs are not a recovery component** and can therefore be considered without a certiorari petition, I would dispose of Mother's post-appeal quest for court costs by allowing two of the requested items (the cost deposit and court reporter's transcript fee) [24] and disallowing the remaining items (the fee for assembling the record and for copying and binding the appellate brief).[25]

## II

### PROCEDURAL ALTERNATIVES TO CERTIORARI ARE AVAILABLE HERE FOR DECIDING MOTHER'S COUNSEL–FEE QUEST

#### A.

*Mother's Motion For An Attorney's Fee Should Be Retransferred To The COCA Division Before Which The Case Stood For Disposition Of Appeal—The Only Appellate Tribunal With Cognizance To Decide Her Timely-filed Counsel–Fee Quest*

¶ 17 If I were writing for the court I would retransfer Mother's counsel-fee quest for disposition by COCA. **Mother's plea should be deemed timely for COCA's consideration because it is addressed to COCA and was filed within 20 days of the opinion's filing.**[26] The transfer order would re-

---

25. *Sunrizon Homes, Inc. v. American Guar. Inv. Corp.*, 1988 OK 145, ¶ 3, 782 P.2d 103, 109 (Memorandum Opinion on Motion for Costs).

26. This approach is not inconsistent with Supreme Court Rule 1.184, *infra*, which deals with quests for post-appeal relief. Its terms state that a motion for an appeal-related attorney's fee "**which remains pending** at the time a petition for certiorari is filed shall be addressed" by this court "**unless the Supreme Court direct otherwise.**" Rule 1.184, *infra* (emphasis added). This court should hence refer to COCA Mother's **fee quest filed after** an earlier timely certiorari petition of Father **but within 20 days** of the opinion's filing.

The pertinent terms of Rule 1.184, Oklahoma Supreme Court Rules, 12 O.S., App. 1, are:
  Requests for post-decisional relief including but without limitation motions for appeal-related attorney's fees, motions for judgment on the supersedeas bond and motions to tax costs

vest COCA with jurisdiction over the motion. I would accordingly direct that, before proceeding to consider the fee quest, COCA refer the controversy to the trial judge, to sit as a special master,[27] to hold a hearing on the issue whether Mother is entitled by the terms of § 112(D)(2) to a counsel-fee award and, if that query be answered in the affirmative, to determine the amount to be allowed for services rendered in the appellate court. At the conclusion of the proceeding the special master should be directed to prepare a report with findings of fact, conclusions of law and a recommended disposition that would be subject to COCA's review by a *de novo* standard.[28]

## B.

### *Mother's Motion For Post–Appeal Relief Should Be Treated As The Functional Equivalent Of A Timely Rehearing Petition*

¶ 18  In the alternative, I would declare Mother's motion for an appeal-related attorney's fee, which was brought within 20 days of the opinion's filing,[29] as a **functional** **equivalent of her petition for rehearing** and make a *nunc pro tunc* transfer to the COCA division whence the case came.[30] The jurisdiction over the appeal **would remain vested** in that COCA division **until** the timely rehearing's disposition.[31] Father's petition for certiorari, which was brought one day earlier than the fee quest, should be treated as prematurely filed, but considered refiled by operation of law as of the time rehearing decision is reached.

¶ 19  In sum, because this court has no cognizance to entertain an enlargement of Mother's appellate recovery *sans* her own timely certiorari petition and **her quest for relief can be viewed as either a timely rehearing petition or motion for postdecisional relief from COCA**, fairness requires that by a *nunc pro tunc* transfer Mother's motion be referred for disposition by COCA.

## III

### THE DISSENTER'S RESPONSE TO THE COURT'S CRITIQUE

¶ 20  Appearing in a somewhat attenuated footnote form, the court's attribution of *in-*

---

(See Rules 1.14 and 1.15) **shall be considered by the division of the Court of Civil Appeals which addressed the merits of the case;** provided, that if a timely petition for certiorari be filed as provided in Rules 1.178 and 1.179, **any motion for post-decisional relief which remains pending at the time the petition for certiorari is filed shall be addressed by the Supreme Court, unless the Supreme Court direct otherwise.** *Chamberlin v. Chamberlin,* 720 P.2d 721 (Okl.1986); *Riffe Petroleum Company v. Great National Corp., Inc.,* 614 P.2d 576 (Okl.1980).
(emphasis added).

27. *See in this connection A–Plus Janitorial & Carpet Cleaning v. The Employers' Workers' Compensation Ass'n,* 1997 OK 37, ¶ 8, 936 P.2d 916, 922; *Huff v. Huff,* 1984 OK 51, ¶ 5, 687 P.2d 130, 132; *McCullough v. Safeway Stores, Inc.,* 1981 OK 38, ¶ 5, 626 P.2d 1332, 1334.

28. A special master's findings are reviewable in this court by a *de novo* standard. *McCullough, supra* note 27, at ¶ 5, at 1334; *Werfelman v. Miller,* 1937 OK 732, 180 Okla. 267, 68 P.2d 819, 820.

29. The COCA opinion was filed on 28 May 2004. The motion for an attorney's fee (directed to COCA) was filed 17 June 2004.

30. There would be no need for a *nunc pro tunc* transfer if the **clerk would consider a fee quest** brought within 20 days of the COCA opinion's **filing in the nature of a rehearing petition.** The timely quest would automatically extend COCA's power over the appeal until the rehearing's disposition.

31. A timely rehearing petition is one that is brought within 20 days of the opinion's filing. See Rules 1.177 and 1.13, Oklahoma Supreme Court Rules, 12 O.S.2001, App. 1. After a petition for rehearing is denied by the Court of Civil Appeals, that court loses jurisdiction of the case, but the Supreme Court may grant post-decisional relief.

The pertinent terms of Rule 1.177 are:
... The **time for filing a petition for rehearing** shall be the same as that prescribed by filing a petition for a rehearing in the Supreme Court. See Rule 1.13. The time shall run from the date the opinion is filed....
(emphasis supplied)
The pertinent terms of Rule 1.13(a) are:
Applications for a rehearing and a brief in support thereof, unless otherwise ordered by the Court, shall be made by petition to the Court, signed by counsel, and filed with the Clerk within twenty **(20) days from the date on which the opinion in the cause is filed....**
(emphasis added)

*consistency* between my dissent here and my concurrence in certain cited cases of yore is hollow in analytical profundity. **Instead of attacking the dissenter's message the critique obliquely targets the messenger's voting pattern it views as discordant.** This approach represents nowadays a dissent-chilling technique of choice.[32] It aims to bring **discredit** upon the daring herald of disagreeable thought. Though indeed an effective weapon, the device nonetheless robs the court of that intellectual richness which nourishes jurisprudence fed by a variety of insights. If the author of the court's opinion took the time to digest the authority on which reliance is placed, she would have doubtless discovered that the "inconsistent cases" are clearly distinguishable in procedural posture. All of them are free of the infirmities the dissent finds present in this case. **In none of them was this court confronted, as it is here, by the absence of a timely-filed jurisdiction-conferring certiorari petition that is of critical moment in this proceeding.**

### IV

### SUMMARY

¶ 21 Because Mother's counsel-fee quest seeks **an enlarged supplemental recovery—** rather than *de cursu* costs by a mere addendum to an already affirmed nisi prius or COCA fee award—**this court has no power to declare here that she is entitled to an appeal-related attorney's fee** as prevailing party (in COCA) under the terms of § 112(D)(2) **without being invested with certiorari cognizance by Mother's own timely petition.**

¶ 22 The invoked statute for imposition of counsel fee requires fact findings to be made upon an adversarial evidentiary inquiry **which this court cannot make initially.** Due process mandates that Father be heard in a forum in which an adversarial evidentiary hearing may be conducted.

¶ 23 There are two procedural alternatives to denial of Mother's fee quest for want of her timely certiorari petition. These are not only inherently fair but also would pre-serve due process to both parties. Her post-opinion counsel-fee quest can (a) be retransferred to COCA for disposition with directions to refer the factual dispute to the trial judge to sit as a special master for a decision on law and fact issues which would then be reviewed (by COCA) by a *de novo* standard or (b) be declared the functional equivalent of a rehearing petition for disposition by the COCA division before which the case stood on appeal.

---

32. *See In re Death of Gray,* 2004 OK 63, ¶ 23, 100 P.3d 691, 697.