2008 OK CIV APP 94

**In re the Marriage of Susan Cherie Fritts KILPATRICK, Petitioner/Appellant,**

v.

**Timothy Allen KILPATRICK, Respondent/Appellee.**

No. 104,661.

Court of Civil Appeals of Oklahoma, Division No. 4.

July 31, 2008.

Certiorari Denied Oct. 27, 2008.

N. Scott Johnson, N. Scott Johnson & Associates, Tulsa, OK, for Petitioner/Appellant.

Lauren LeBlanc Day, Newalla, OK, for Respondent/Appellee.

Opinion by DOUG GABBARD II, Presiding Judge.

¶ 1 Petitioner/Appellant, Susan Cherie Fritts Kilpatrick (Mother), appeals the trial court's denial of her motion to terminate joint custody, and its finding that she was guilty of contempt of court. We affirm the trial court's order as modified herein.

## FACTS

¶ 2 In September 2001, Mother married Respondent/Appellee, Timothy Allen Kilpatrick (Father), a week after their child was born. In January 2005, they were divorced.

At the request of the parties, and upon recommendation of a psychologist, the trial court granted the parties joint custody of their child, with the child residing primarily with Mother, who lived in Fayetteville, Arkansas. Father, who lived in Bartlesville, Oklahoma, received "parenting time periods" on Monday afternoons in Arkansas and from Thursdays to Saturdays in Bartlesville. The court ordered the parties to share decision-making authority as to medical, dental, and mental health care for the child.

¶ 3 A few months after the divorce became final, Father filed a contempt application against Mother, alleging that she had violated the decree by taking the child to see a psychologist without giving him notice or obtaining his consent. Father later filed a motion to terminate joint custody and to obtain sole custody, alleging that Mother had violated the decree about decision-making, had engaged in "coaching, alienation, and attempted brain washing" of the child, and had falsely accused him of sexually abusing the child. He asserted Mother had pressured the child to love him less, had criticized him, and had failed to treat him "with appropriate respect."

¶ 4 Mother filed her own motion to terminate joint custody and to obtain sole custody. She gave no specific reason for termination, but alleged that she was the proper person to have sole custody. Later, she also filed a contempt action against Father, alleging that he had enrolled the child in a school without her consent.

¶ 5 The trial took 20 days over a four-month period. Although both parties claimed that joint custody was no longer workable, there was evidence that the child was doing well and thriving. Dr. Bart Trentham, Mother's expert, opined that each party parented the child well individually, but did not co-parent well. He recommended that Mother receive sole custody but acknowledged that this could also lead to future conflict and litigation. He admitted that both parents have kept their personal conflict away from the child, and that preserving each parent's influence and role in the child's life was the most important consideration for the court.

¶ 6 Dr. Hal McBride, Father's expert, opined that neither party was an ideal candidate for independently parenting the child or for an unstructured joint custody plan. He recommended continued joint custody using a strong and experienced parenting coordinator, and also recommended that the child live with one parent during the school year and the other parent during the summer.

¶ 7 Laura Emily Fisher, a psychologist and parenting coordinator, testified that communication between the parents, though tedious and painstaking, eventually led to resolution, and that even though the parents were in high conflict, joint custody could work with a strong parenting coordinator. She recommended that Mother have the child during the school year. Neither Fisher nor the sexual assault nurse who interviewed the child, nor the forensic interviewer, nor the Department of Human Services worker assigned to the child's case, found any evidence of sexual abuse.

¶ 8 At the conclusion of trial, the trial court found that the child was doing well in joint custody, and that joint custody should continue as modified. The court found:

9. That the degree of acrimony and ill-will demonstrated between the parties indicates that the opportunity to abuse the position of sole custodian is too great to be overlooked. The positive input of the noncustodial parent would suffer and the benefits to the child would be placed in jeopardy.

10. That it is regretful that the development of the parties in their intellectual and educational achievements is not matched by them in their development as parents, in so far as the recognition of the other in their respective parenting roles is concerned.

11. That although both parties seek termination of the Joint Child Custody Plan, the Court finds that the best interests of the child would not thereby be served. The Court finds that continuation of the Joint Plan with modifications would best serve the interests of [the child]. . . .

¶ 9 In continuing joint custody, the trial court also: a) adopted a new visitation schedule in which the child remained with Mother during the school year and with Father during the summer, with every-other-weekend visitation by the other parent; b) appointed a Tulsa attorney as the new parenting coordinator with "wide discretion in resolving issues and disputes between the parties and that his recommendations should be observed as orders of the Court"; c) dismissed Mother's application for contempt against Father, but found Mother in contempt for scheduling appointments with the psychologist without Father's knowledge or consent. Mother appeals.

## STANDARD OF REVIEW

■ ¶ 10 Joint custody proceedings are governed by 43 O.S.2001 § 109, which provides that the court may modify or terminate joint custody upon the request of one or both parents or whenever it determines that joint custody is not in the best interests of the child. An appellate court will not disturb the trial court's judgment regarding custody absent an abuse of discretion or a finding that the decision is clearly contrary to the weight of the evidence. *Daniel v. Daniel*, 2001 OK 117, ¶ 21, 42 P.3d 863, 871.

## ANALYSIS

■ ¶ 11 Mother first asserts the trial court abused its discretion in refusing to terminate joint custody at the request of both parties, and in failing to award her sole custody. Pursuant to 43 O.S.2001 § 109(F), a court may modify the terms of a joint custody plan upon the request of one parent when modification is in the best interests of the child. In addition, subsection (G) provides that:

1. The court *may* terminate a joint custody decree upon the request of one or both of the parents or whenever the court determines said decree is not in the best interests of the child. (Emphasis added)

¶ 12 In *Daniel v. Daniel*, the trial court entered a decree awarding joint custody whereby the child lived in Arkansas with Mother during the school year and in Oklahoma with Father during the summer. Subsequently, both parties moved to terminate

the joint custody order, with each parent alleging that the other was uncooperative and antagonistic. When the trial court terminated joint custody and awarded Father sole custody, Mother appealed. In affirming, the Supreme Court noted that § 109 authorizes termination of joint custody at the request of one or both parents, or whenever the court finds that joint custody is not in the child's best interests. The Court further stated:

[A] change in custody from joint to one parent differs from a change in custody from a one custodial parent to a non-custodial parent. Joint custody will not succeed without the cooperation of the parties. *When it becomes apparent to the court that joint custody is not working and it is not serving the child's best interests, then a material and substantial change of circumstance has occurred and the joint custody arrangement must be vacated.* The mother argues that the trial court's termination of joint custody and change of physical custody during the school year was mainly based on the fact that she had moved to Arkansas. However, in addition to the fact that she had moved out-of-state, it was undisputed that the joint custody arrangement was not working. The record contains ample evidence that the parties were unable to agree and cooperate with each other. Several instances of hostility and uncooperativeness between the parents were presented to the trial court. The trial court's determination that joint custody should be terminated is clearly supported by the evidence.

. . . . We have reviewed the transcripts and the record in this cause and cannot say the trial court's determination is contrary to the best interests of the child. *There was conflicting testimony presented by both parents relating to how the child's interests would best be served. The trial court is better able to determine controversial evidence by its observation of the parties, the witnesses and the demeanor.* The judgment of the trial court is not against the clear weight of the evidence.

2001 OK 117 at ¶¶ 20, 22, 42 P.3d at 870–71 (emphasis added; footnotes omitted).

¶ 13 Joint custody is usually not appropriate where both parties object, because joint custody depends upon the agreement of the parties and their mutual ability to cooperate in reaching shared decisions affecting the child's welfare. *Anderson v. Anderson*, 1990 OK CIV APP 23, 791 P.2d 116. A party's opposition to joint custody indicates his or her lack of willingness to cooperate, and "[t]o force joint custody on an unwilling parent should give a trial court pause." *Fast v. Fast*, 1989 OK CIV APP 31, ¶ 4, 787 P.2d 1288, 1290. Nevertheless, consideration must also be given to the positive effect, if any, that a joint custody plan has had on a child. Section 109(G) does not require termination of joint custody merely because one or both parents request it; it provides that a trial court "may" terminate joint custody in such event. Ultimately, custodial decisions, even those involving termination of joint custody, are dependent upon the best interests of the child. Only when "joint custody is not working and it is not serving the child's best interests" is termination a "must." *Daniel* at ¶ 20, 42 P.3d at 870.

¶ 14 In *Rice v. Rice*, 1979 OK 161, 603 P.2d 1125, the Supreme Court referred to several factors that should be considered in determining whether joint custody is appropriate: 1) whether the parties agree to joint custody and whether there is a prior order of joint custody which has been of benefit to the child; 2) whether the parties are capable of reaching shared decisions regarding the child; 3) whether the logistics are such that there is no substantial disruption of the child's routine, schooling, friends, etc.; 4) whether the child's psychological and emotional needs and development will suffer due to the custody arrangement; 5) the work hours of the parents; and 6) whether the child desires to participate in joint custody or has a strong opposition thereto. *Id.* at n. 9.

¶ 15 In the present case, conflicting evidence was presented regarding the parents' ability to cooperate if joint custody was continued. However, the trial court was in the best position to resolve this conflicting evidence because it was able to observe the parties, the witnesses and their demeanor.

*See Manhart v. Manhart,* 1986 OK 12, 725 P.2d 1234. In doing so, the trial court clearly understood the relevant rules, and reluctantly determined that a modified joint custody plan was the best of imperfect alternatives. The trial court agreed with witnesses McBride and Fisher that the parents could resolve issues well enough, with the assistance of a parenting coordinator, for joint custody to work. It also agreed that such a plan was in the child's best interests—a conclusion supported by the fact that the child had indisputably thrived during joint custody despite her parents' conflict and antagonisms. Based upon the transcripts and the record, we cannot say that the trial court's decision is contrary to the child's best interests, or an abuse of discretion.

¶ 16 The modified joint custody order conforms custody and visitation to the child's school schedule and provides for more active participation by the parenting coordinator to facilitate cooperation. However, the trial court's order that the parenting coordinator's "recommendations should be observed as orders of the Court" must be stricken. Requiring such recommendations to be viewed "as orders of the Court" constitutes an improper delegation of judicial power to the parenting coordinator, and is contrary to the parents' due process rights under the Oklahoma and U.S. Constitutions. *See Conaghan v. Riverfield Country Day School,* 2007 OK 60, 163 P.3d 557. Thus, we hereby modify the order by striking the phrase, "as orders of the Court," from paragraph 12 of the trial court's journal entry of judgment.

¶ 17 Mother appeals two other aspects of the trial court's order. First, she asserts the trial court erred by failing to order Father to undergo an alcohol and drug assessment. Second, she appeals the trial court's finding that she is guilty of contempt of court for violating the decree provision providing that the parties would jointly decide on the child's medical, dental, and mental health care.[1]

¶ 18 The trial court found that both parents had some drug history, with Father's being the more recent and extensive. Furthermore, although Father could have benefitted from a drug assessment, the trial court stated that it "declines to order the same at this time." No evidence was presented to dispute Father's statement that he was not presently using illegal substances; that he gave up drugs when he realized their harmful effects upon himself and his child; and that he had taken and passed drug tests as recently as 2006. Although the court could have ordered periodic assessments, it was not required to do so. We find no error in this regard.

¶ 19 Regarding the contempt citation, Mother claims she took the child to a psychologist because the child made statements which suggested that Father might have sexually abused the child. Mother relies upon *King v. King,* 2005 OK 4, 107 P.3d 570, where a mother refused to allow a father visitation because of a good cause belief that the child was being sexually abused by others while in the father's custody. For that refusal, the trial court granted the father's motion to modify custody. In reversing, the Supreme Court cited 43 O.S. Supp.2003 § 112(D)(1), for the proposition that a party may refuse court-ordered visitation for good cause, and noted that the mother had taken the more reasonable option of two uncomfortable choices: denying court-ordered visitation or putting her parental rights in jeopardy.

¶ 20 The *King* decision was based upon a specific statute which created a "good cause" defense for refusing court-ordered visitation. Even if a similar defense applied to other custodial orders, conflicting evidence was presented here regarding whether the child had actually made certain statements and whether those statements were sufficient to justify Mother's unilateral medical investigation.[2] The trial court did not resolve the

---

1. The record does not reflect that a sentence was entered on the contempt finding, thus raising the question of whether this issue is appealable. See Supreme Court Rule 1.21(e)(1). However, a review of the court's docket indicates that Mother

received a three-month suspended sentence; we thus conclude the matter is properly before this Court.

2. According to the report of therapist Virginia Krauft, Mother alleged that the child had vaginal

conflicting evidence in favor of Mother. As noted above, where there is conflicting evidence on an issue of fact, we defer to the judgment of the trial court, which is in the best position to observe the demeanor of the witnesses and to gauge their credibility. Accordingly, we find no reason to disturb the trial court's finding that Mother was guilty of contempt of court.

## CONCLUSION

¶ 21 For the reasons set forth above, the trial court's order is affirmed as modified, and its contempt order is also affirmed.

¶ 22 AFFIRMED AS MODIFIED.

RAPP, C.J., and BARNES, J., concur.

information, had complained of pain in her private areas, and had made disturbing comments about visitations with Father. However, Krauft interviewed the child, and was unable to verify most of these complaints and found innocent explanations for the child's statements. In fact, she was unable to verify that any abuse had occurred. Record, Vol. I, pages 156–162. A forensic examination also failed to verify that abuse had occurred. In addition, evidence was presented that Mother tried to "set up" Father by requesting Father commit some of the conduct which she later stated was "suspicious."