IN RE THE MARRIAGE OF WALTERS
2025 OK CIV APP 3
Case Number: 120023
Decided: 12/11/2024
Mandate Issued: 02/06/2025
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2025 OK CIV APP 3, __ P.3d __

 

IN RE THE MARRIAGE OF:

MARY KATHRYN WALTERS, Petitioner/Appellee/Counter-Appellant,
v.
RYAN TODD WALTERS, Respondent/Appellant/Counter-Appellee.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, OKLAHOMA

HONORABLE ELIZABETH KERR,TRIAL JUDGE

AFFIRMED IN PART, VACATED IN PART, AND REMANDED

Laura McConnell-Corbyn, HARTZOG CONGER CASON, LLP, Oklahoma City, Oklahoma, for Petitioner/Appellee/Counter-Appellant

Betsy Ann Brown, Jade M. Pebworth, Abilene Slaton, BIC LEGAL, PLLC, Norman, Oklahoma, for Respondent/Appellant/Counter-Appellee

JAMES R. HUBER, JUDGE:

¶1 Mary Kathryn ("Mary Kate") Walters married Ryan Walters in 2006 and filed for divorce in 2019. At trial, Mary Kate sought sole custody, authorization to permanently relocate out-of-state, child support, support alimony, and valuation of certain jointly owned assets. The district court granted Mary Kate each of these requests and found Ryan committed "domestic abuse" during the marriage. Ryan appeals these rulings. The court also granted, in part, Mary Kate's request for attorney fees. Ryan appeals from the attorney fee award, primarily arguing that it was erroneous to the extent it was based on a finding of domestic abuse. Mary Kate counter-appeals the attorney fee award, arguing that the court erred in significantly reducing the award. We vacate the provision related to Ryan's maintenance of life insurance to secure unpaid child support and support alimony and remand for the entry of a new provision consistent with existing precedent. As to the award of attorney fees and costs, we deny Ryan's appeal, but vacate the order pursuant to Mary Kate's appeal, and remand the case for the entry of a new award. In all other respects, the Decree of Dissolution of Marriage is affirmed.

I. BACKGROUND

¶2 Ryan and Mary Kate Walters met while attending college and were married in 2006. While Ryan and his family are Oklahoma natives, Mary Kate moved to Oklahoma in 2002 from Shreveport, Louisiana, where she was born and raised and where her parents and three brothers still reside. Two children were born of the marriage, ages four and six at the time of trial.

¶3 Mary Kate filed for divorce in April 2019. She also filed an application for temporary orders asking the court to make her the sole custodian of the children and ordering Ryan to pay child support. A temporary order hearing was held over a period of two days in July 2019. The primary issues at the temporary order hearing related to custody and visitation with the children, support alimony, child support, and the children's current school situation. Mary Kate specifically requested that the children spend every other weekend and one evening per week with Ryan.

¶4 Mary Kate also requested right of first refusal when the children are with Ryan. The reason for her request was because Ryan would be living with his parents, who, according to Mary Kate's proffered testimony, the parties initially agreed to restrict the children's time with due to certain frictions in that home. To maintain the children's sense of stability and routine, she also requested that Ryan pay tuition for the children to be able to stay at their current school, which is a "Mother's Day Out" preschool program at Quail Springs Baptist Church. Ryan wanted the oldest to attend Centennial Elementary School in Edmond Public Schools, because it is an academic program and not just a "babysitting service."

¶5 Mary Kate also alleged domestic violence in the form of verbal and emotional abuse at the temporary order hearing. Mary Kate claimed the abuse consisted of Ryan, on numerous occasions, getting in Mary Kate's face, screaming at her, calling her names, cursing at her in front of the children, all to the point of Mary Kate becoming fearful of Ryan. Ryan denied these allegations.

¶6 Seven months after filing the application for temporary orders, the court entered its temporary orders. Although Mary Kate requested a finding of domestic violence, the district court did not make such a finding and awarded the parties joint custody. The court's temporary orders also included appointment of a guardian ad litem (GAL), temporary possession of certain property, prohibitions on drinking alcohol while with the children, and a right of first refusal to watch the children for both parties. The court also ordered the oldest child to continue school at Quail Springs Baptist Church and for Ryan to pay the mortgage and all the insurance premiums.

¶7 A six-day trial began on April 19, 2021. The issues to be decided at trial were as follows: custody (Mary Kate requested sole custody with long distance visitation for Ryan, whereas Ryan requested joint custody), Mary Kate's request to relocate with the children to Shreveport, allocation and valuation of certain property, child support, and support alimony. The underlying issue of domestic abuse was heard throughout the trial.

¶8 At the time of trial, Ryan was employed by VMware, which provided him a more flexible travel schedule. Mother is a licensed attorney. She worked at a law firm in Oklahoma City before electing to stay home with their children in January 2018, fifteen months before she filed for divorce. Mary Kate claims the decision for her to stay home was an agreement between her and Ryan, while Ryan states there was no such agreement.

¶9 The district court heard testimony from several people including both parties, Ryan's brother, both of Ryan's parents, Mary Kate's brother, Mary Kate's mother, several family friends, two nannies for the parties, two experts regarding domestic abuse, and two experts regarding certain property valuation. A large amount of testimony and questioning in one way or another involved Ryan's behavior and the effect it had on Mary Kate.

¶10 At the conclusion of the trial, the court found that, pursuant to 43 O.S.2021 § 109

¶11 In a subsequent order, the district court awarded Mary Kate $115,977.39 in attorney fees and costs. Mary Kate had requested $221,120.0143 O.S.2021 § 112.643 O.S.2021 § 110Id. The district court did not expressly address an award of attorney fees and costs pursuant to 43 O.S.2021 § 110

¶12 Ryan seeks vacatur of the fee award in toto, arguing that it is premised on a faulty finding of domestic abuse. Mary Kate counter-appeals the district court's reduction of her request of attorney fees is contrary to law.

¶13 Mary Kate also requests appeal-related attorney fees. Mary Kate argues that appeal-related attorney fees are mandatory on appeal when the underlying attorney fees statute is mandatory, as in 43 O.S.2021 § 112.6

II. STANDARD OF REVIEW

¶14 Domestic relations cases are of equitable cognizance and are governed by equitable standards of review. Marshall v. Marshall, 1961 OK 86364 P.2d 891Hough v. Hough, 2004 OK 4592 P.3d 695de novo. Smith v. Smith, 1993 OK CIV APP 17847 P.2d 827

¶15 "We review de novo the question of whether a party is entitled by statute to an award of attorney fees." Kurtz v. Clark, 2012 OK CIV APP 103290 P.3d 779de novo standard." Antini v. Antini, 2019 OK 20440 P.3d 57de novo review, this Court possesses plenary, independent, and non-deferential authority to examine the lower tribunal's legal rulings." Id.

III. ANALYSIS

¶16 Ryan argues on appeal that the district court erred in: (a) finding he committed domestic abuse during the marriage, (b) awarding any attorney fees to Mary Kate, (c) awarding sole custody to Mary Kate, (d) allowing Mary Kate to permanently relocate to Shreveport with the children, (e) awarding support alimony, (f) valuing a marital business, (g) ordering Ryan to take out life insurance policies that would cover child support and alimony payments in the event of his death, and (h) violating Oklahoma's policy of equal access to children. in her counter-appeal, Mary Kate alleges that the district court erred in its reduction of attorney fees under the applicable statute.

(A) The Finding of Domestic Abuse

¶17 The trial court made the following findings related to domestic abuse:

4. Domestic Violence. The Court finds, pursuant to 43 O.S. §109

Ryan challenges these findings on appeal.

Domestic violence is defined in Title 43:

"[D]omestic violence" means the threat of the infliction of physical injury, any act of physical harm or the creation of a reasonable fear thereof, or the intentional infliction of emotional distress by a parent or a present or former member of the household of the child, against the child or another member of the household, including coercive control by a parent involving physical, sexual, psychological, emotional, economic or financial abuse, . . .

43 O.S.2021 § 109

¶18 Having reviewed the full record, we find that the court's findings are consistent with the evidence. Most tellingly, Mary Kate offered two accounts of physical abuse that occurred during the marriage. As to the first, she testified as follows:

The first time was maybe a year or two after we got married, and we were having a disagreement about something in our bedroom. I don't remember what it was. And he was kind of lying down kind of propped up on the bed, and he was--he had been yelling at me and was saying cruel things to me, as (sic) being very demeaning towards me.

And I walked closer to the edge of the bed, and I was trying to explain to him. You know, I can't remember what it was, but I was like, "That's not what I said or that's not what I did. Let's just, you know, talk about this." And he suddenly, without warning, reached over the bed and kicked me in the stomach and the kidneys backwards. And I started crying and immediately left the house . . . .

Tr. Vol. II, 339 (internal quotation marks added).

Mary Kate testified to a second incident as follows:

The second time was maybe I would say a year or two after that. I can't remember exactly. It was in our old house on the south side of Oklahoma City. And Ryan was screaming at me, being verbally abusive and cursing at me. And I got frustrated and I grabbed one of the couch pillows off the sofa and threw it at him. And he charged at me from across the room and grabbed me just underneath the shoulders and grabbed me really hard and pushed me up against the stair railing and held me there for, I don't know, a minute, 30 seconds, 60 seconds, held me there so that I could not move, and screamed in my face and cursed in my face, and then let me go. And shortly after that, fingerprints started to appear on my arms [which] turned into bruises . . . .

Id. at 340-41.

¶19 Ryan denied that these events occurred,

(B) Attorney Fees and Costs

¶20 Both parties appeal different aspects of the district court's attorney fee award. Ryan argues the district court erred in awarding any attorney fee to Mary Kate pursuant to 43 O.S.2021 § 112.6de novo." Friend v. Friend, 2022 OK 29506 P.3d 1092Ellis v. Lebowitz, 1990 OK 107799 P.2d 620

1. Ryan's Appeal

¶21 Ryan contends the district court erred in awarding attorney fees and costs under 43 O.S.2021 § 112.643 O.S.2021 §§ 11043 O.S. § 112.6

¶22 Section 112.6 provides:

In a dissolution of marriage or separate maintenance or custody proceeding, a victim of domestic violence or stalking shall be entitled to reasonable attorney fees and costs after the filing of a petition, upon application and a showing by a preponderance of evidence that the party is currently being stalked or has been stalked or is the victim of domestic abuse. The court shall order that the attorney fees and costs of the victimized party for the proceeding be substantially paid for by the abusing party prior to and after the entry of a final order.

43 O.S.2021 § 112.6

¶23 "The word 'shall' expresses a command or a mandatory directive creating an unequivocal right that leaves no discretion with the court to deny it." Antini v. Antini, 2019 OK 20440 P.3d 57Antini Court held that the fee-shifting provision in § 551-312 of the Uniform Child Custody Jurisdiction and Enforcement Act "does not leave the decision of whether to award fees to the trial court's discretion [but] is a mandate . . . ." Id. ¶ 15, 440 P.3d at 61. For the reasons discussed infra, we hold that the Legislature intended the fee-shifting provision in section 112.6 to be mandatory in dissolution of marriage, separate maintenance, or custody proceedings upon a domestic violence victim's application.

¶24 For most of the State's history, attorney fees in dissolution of marriage cases were granted, if at all, "only to the litigant who qualifie[d] for the benefit through the process of a judicial balancing of the equities." King v. King, 2005 OK 4107 P.3d 57043 O.S.2021 § 110Friend v. Friend, 2022 OK 29506 P.3d 1092Thielenhaus v. Thielenhaus, 1995 OK 5890 P.2d 925may be granted only to that litigant who qualifies for the added benefit by the mandated process of judicial balancing of the equities." Stork v. Stork, 1995 OK 61898 P.2d 732

¶25 However, since 1989 the Legislature has adopted several statutes providing additional authority for an award of attorney fees in specific dissolution of marriage circumstances.43 O.S.2021 § 112.643 O.S.2021 § 112.6

¶26 As distinguished from the discretion involved in deciding whether to award attorney fees pursuant to 43 O.S.2021 § 110Cf., Friend v. Friend, 2022 OK 29506 P.3d 109243 O.S.2021 § 111.1King v. King, 2005 OK 4107 P.3d 570Roodzant v. Roodzant, 2020 OK CIV APP 50476 P.3d 938Accord Hubert v. Hubert, 2023 OK CIV APP 40540 P.3d 1103 Roodzant that 43 O.S.2021 § 112.6.

¶27 Ryan argues that the district court erred in awarding Mary Kate attorney fees because "[t]his is not the type of case . . . § 112.6 was passed to address." The only case Ryan cites in support of this argument is Roodzant. However, that case stands for the proposition that this is exactly the type of case section 112.6 was passed to address. It is the finding of domestic violence, not the degree of that abuse, which determines whether the fee-shifting mandated by section 112.6 is triggered. The district court found that Mary Kate was the victim of domestic violence. "This finding triggers a court, if requested, to award attorney fees and costs pursuant to 43 O.S.2011 § 112.6Roodzant, 2020 OK CIV APP 5043 O.S.2021 § 112.6

2. Mary Kate's Counter-Appeal

¶28 Mary Kate's counter-appeal raises a different issue -- was the amount of the attorney fee awarded pursuant to section 112.6 a "substantial" portion of the "reasonable" attorney fee mandated by the statute? Although the entitlement to an attorney fee in this case is resolved by the clear and unambiguous language of section 112.6, the issue Mary Kate raises is not.

¶29 Mary Kate's sole issue in her counter-appeal is that the district court erred in failing to award all her attorney fees and costs after the filing of her petition under section 112.6. Mary Kate points out that the district court limited her requested attorney fees and costs to those incurred after discovery was concluded. According to the district court, "it was after the discovery cutoff date that abuse became the primary issue." R. 887. The court reasoned that "the discovery time and attorney time up to that point would have been substantially the same whether abuse was proven at trial or not." R. 887. Mary Kate argues that the Legislature did not include limiting language in section 112.6 and, therefore, intended for the abusing party to pay for all reasonable attorney fees and costs incurred for all proceedings after the filing of the petition. At issue, therefore, is the proper construction of the terms "reasonable" and "substantially" and whether section 112.6 requires an award of "all" of the domestic violence victim's attorney fees.

¶30 "The fundamental rule of statutory construction is to ascertain and give effect to legislative intent, and that intent is first sought in the language of a statute." In re T.H., 2015 OK 26348 P.3d 1089In re J.L.M., 2005 OK 15109 P.3d 336Antini v. Antini, 2019 OK 20440 P.3d 57Schiewe v. Cessna Aircraft Co., 2024 OK 19546 P.3d 234

¶31 "[T]he evils and mischiefs to be remedied" by section 112.6 are domestic violence and domestic abuse, matters the Legislature deems of serious concern. See e.g., 43 O.S.2021 § 10943 O.S.2021 § 112.222 O.S.2021 §§ 60

¶32 Section 112.6 is one of, at least, five statutes providing for attorney fees in specific circumstances in dissolution of marriage cases. Each statute applies if the facts and circumstances of the case satisfy the requirements set out in the statute, e.g., when a party to the litigation has been the victim of domestic violence (§ 112.6), or when a party refuses without cause to comply with a visitation or child support order (§ 111.1(C)(3)).

¶33 Mary Kate contends that the Legislature intended for her to be awarded all of her attorney fees and costs when section 112.6 applies. However, the Legislature did not use the same language in section 112.6 that it used in 43 O.S. § 107.3all court costs and legal expenses" of the other party. (Emphasis added). And, shifting all of one party's attorney fees to the other is inconsistent with the section 112.6 mandate to award only a substantial portion of the other party's reasonable attorney fees. We hold that the Legislature did not intend for the victim of domestic abuse to be awarded "all" reasonable attorney fees pursuant to section 112.6 as Mary Kate argues.

¶34 Likewise, there is no limiting language in section 112.6 similar to the language the Legislature used in 43 O.S.2021 § 111.1

¶35 As previously discussed in Part III(B)(1), the district court's finding that Ryan committed domestic violence within the marriage mandated an award of attorney fees and costs in favor of Mary Kate under section 112.6. From there, section 112.6 requires consideration of all fees and costs reasonably incurred "after the filing of a petition." 43 O.S.2021 § 112.6

¶36 The district court's application of section 112.6 is contrary to the language of the statute. Section 112.6 entitles a victim of domestic abuse, such as Mary Kate, upon application, to a substantial portion of his or her reasonable attorney fees and costs incurred "after the filing of a petition" and does not exclude any period of the litigation. We find the district court's reduction of the fees requested on this basis to be contrary to the language of the statute and inconsistent with the purpose of section 112.6.

¶37 Next, in determining an award pursuant to section 112.6, the district court must determine what is a reasonable fee.State ex rel. Burk v. City of Oklahoma City, 1979 OK 115598 P.2d 659In re Adoption of Baby Boy A, 2010 OK 39236 P.3d 116McCain v. State Election Bd., 1930 OK 323289 P. 759

Where a judicial construction has been placed upon the language of a statute for a long period of time, so that there has been abundant opportunity for the law making power to give further expression to its will, its failure to do so amounts to a legislative approval and ratification of the construction placed upon the statute by the courts.

Id. ¶ 0, 289 P. at 760.

¶38 In equitable proceedings, "consideration of relevant Burk criteria to determine reasonableness of . . . attorney fees is discretionary." In re Adoption of Baby Boy A, 2010 OK 39Burk criteria to determine the attorney fee issue "would not, without more, constitute an abuse of discretion . . . ." Id. However, when determining what is a "reasonable" fee under a mandatory attorney fee statute, such as Section 112.6, the Burk factors provide clear and compelling guidance.

¶39 Once the district court determines the amount of reasonable attorney fees and costs, the court is required, pursuant to Section 112.6, to order the abusing party to pay substantially all of that amount. As previously noted, the Legislature did not define the term "substantially" in section 112.6. The plain meaning of "substantially" is "[c]onsiderable in importance, value, degree, amount, or extent . . . . Achieving the goal of justice itself, not merely the procedure or form that is a means to justice . . . ."

¶40 Consequently, within the statutory parameters, the district court is free to exercise its discretion in determining the amount of attorney fees to award the victim of domestic violence under section 112.6. The Legislature intended that result by use of the undefined terms "reasonable" and "substantially" in section 112.6. "In absence of an attempt to define any of the terms used in the statutes in question, it must be presumed the legislature considered it unnecessary to define particular words and phrases, and that it was intended only that same bear their usual and commonly accepted meaning." Shellem v. Gruneweld, 2023 OK 26535 P.3d 1208Stemmons, Inc. v. Universal C.I.T. Credit Corp., 1956 OK 221301 P.2d 212

¶41 Here, the district court's application of section 112.6 is contrary to the language of the statute. Section 112.6 entitles a victim of domestic abuse, upon application, to a substantial portion of his or her reasonable attorney fees and costs incurred after the filing of a petition. Accordingly, we vacate the district court's determination and award of attorney fees and costs. On remand, pursuant to 43 O.S.2021 § 112.6See Merritt v. Merritt, 2003 OK 6873 P.3d 878

¶42 In entering its order awarding attorney fees, the district court should "with specificity of facts and computations to support an award, include findings of fact regarding hours spent, reasonable hourly rates and the value placed on additional factors in each case." Fleig v. Landmark Constr. Group, 2024 OK 25549 P.3d 1208Morgan v. Galilean Health Enters., Inc., 1998 OK 130977 P.2d 357Accord Smith v. Smith, 2013 OK CIV APP 54305 P.3d 1054

(C) Custody

¶43 Ryan also argues that the evidence did not support the district court's finding of sole custody to Mary Kate.

¶44 Joint custody is inappropriate if it is evident that the parties cannot get along sufficiently to parent the children together. Joint custody requires parents who can communicate, work together, and engage in joint discussions with each other to make joint decisions in the best interest of their children. Foshee v. Foshee, 2010 OK 85247 P.3d 1162Broadbent v. Broadbent, 2019 OK CIV APP 61451 P.3d 930

¶45 The evidence of hostility between the parties at trial was vast. Both parties at one time or another began recording their interactions because the level of trust between them had so deteriorated. The testimony indicated that the parents were unable to jointly decide where the children would go to school, whether the children would receive certain vaccines, and which doctors they would see. While Ryan maintained at trial that he could co-parent with Mary Kate, he stated the opposite at his deposition.

¶46 Ryan also argues on appeal that the district court erred in considering evidence that had an insufficient nexus to his fitness for custody. The evidence that Ryan takes issue with is his visit to the Ku Klux Klan headquarters in Arkansas, his purchase of memorabilia there, and numerous speeding tickets, all of which the district court cites in her ruling as "display[ing] reckless behavior." R. 805. While the district court mentioned the visit to the Ku Klux Klan and the speeding tickets in its decision regarding custody, we do not view these as the sole facts the court considered in awarding sole custody to Mary Kate. And in any event, as discussed above, because there is more than sufficient evidence in the record to support the denial of joint custody, we will not disturb the district court's order regarding custody. See In re Est. of Bartlett, 1984 OK 9680 P.2d 369

(D) Relocation

¶47 Ryan next contends that Mary Kate's relocation request was not made in good faith and was not in the children's best interest. After a non-relocating parent has been given notice of the intent of the other parent to relocate and has objected, the relocating parent has the burden of proving that the proposed relocation is made in good faith. 43 O.S.2021 § 112.3Arulkumar v. Arulkumar, 2022 OK 90521 P.3d 13143 O.S.2021 § 112.3Id. ¶ 8, 521 P.3d at 135.

¶48 At trial, Mary Kate testified that her intent in moving to Shreveport was to be closer to her parents and siblings, all who remained there. She also had available to her a home owned by her family, on a block adjacent to both her parents and her siblings and their families, that she would be able to live in with the children, rent-free. She also had a job waiting for her, with a flexible schedule, at her brother's law firm. Tr. Vol. II, 450-451, 453.

¶49 Ryan countered that it was his belief that Mary Kate's intent was solely to limit his time with the children. In support of this, he quotes her testimony from where she said that her and the children "would all be healthier with some distance from Ryan . . . ." Tr. Vol. II, 451. Although the GAL did testify that these words initially caused him concern, he later clarified that any concern he had with Mary Kate's statement about getting distance from Ryan was resolved in his last conference with Mary Kate and by her own testimony at trial. He said that he understood her words to mean that she needs to be out of her current community in order to heal from the emotional abuse she had suffered, which would require time and space away from Ryan.

¶50 Ryan further alleged that Mary Kate had denied him additional time with the children. In response to this, the district court said there was no "proof of that, any dates, any examples, nothing like that. So I don't hold a whole lot of credence with that at this point." Tr. Vol. III, 690. The district court ultimately found that Mary Kate met her burden of good faith and that there was no testimony or other evidence that tended to show that the relocation was in bad faith designed to deprive Ryan of visitation.

¶51 We agree with the district court that nothing in the record corroborates Ryan's assertion that it was Mary Kate's primary intent to deprive him of time with the children. We also find ample evidence to support the court's finding of good faith. Ryan's own testimony suggests Mary Kate has an excellent family support system in Shreveport. She also has flexible employment lined up and a free home to live in with the children. This all supports the idea that Mary Kate is relocating in good faith for the primary purpose of putting herself in a position to prosper for both her and her children, and not to reduce Ryan's time with the children.

¶52 After good faith was shown, the burden shifted to Ryan to show that the relocation was not in the children's best interest. Title 43 O.S.2021 § 112.3Id. The GAL testified that he believed each applicable factor supported relocation, and we agree.

¶53 The children were not old enough to take into consideration their preference, but the remaining factors all support relocation. It is clear from testimony at trial that Mary Kate was the primary caretaker during the marriage. Both nannies testified that Mary Kate would do everything for the children while Ryan was hardly involved with their caretaking. Logistically, the GAL explained that he saw at least one long weekend per month on the calendar for the school the children would be attending in Shreveport, which would give Ryan the opportunity to maintain his relationship with the children. While the separation from Ryan would be difficult, the GAL testified that "the relationship [with Ryan] will be different, but I believe it can be maintained." The quality of life was also found to likely increase after the relocation due to the previously mentioned testimony regarding Mary Kate's strong support system of her family of origin in Shreveport and her need to get out of the community she's been in to heal from emotional abuse.

¶54 Ryan's primary concern and argument in the best-interests analysis was again Mary Kate's "stated intent to take the children far away from him which will serve to thwart his relationship with the children." Brief-in-chief, 20. As discussed above, Ryan's argument here is not supported by the evidence and we find it unconvincing. Her statement about getting distance from Ryan was rejected by the GAL and, ultimately, the district court when it found her intention was not to deprive Ryan of time with the children.

¶55 Ryan also cites to the children's relationship with his family and their friends to support his contention that it was not in the best interest of the children to move them to Shreveport. But the record includes evidence to support the fact that the children have good relationships with both sides of the family. Mary Kate, her brother, her mother, and even Ryan, all testified to the great support system the children have with her family in Shreveport as well as the safety of the city.

(E) Support Alimony

¶56 Ryan next alleges error in the award of $60,000 in support alimony, to be paid at $2,500 per month for twenty-four months.

¶57 Support alimony in Oklahoma is a need-based concept, with the purpose of cushioning the economic impact of a spouse's post-marriage transition and readjustment to gainful employment. The spouse seeking alimony bears the burden of demonstrating their need. Ray v. Ray, 2006 OK 30136 P.3d 634Id. ¶ 10, 136 P.3d at 636-37.

¶58 Mary Kate, while once a partner at an Oklahoma law firm, has not worked since January 2018 and has primarily concerned herself with raising the parties' minor children. She testified that she has a position with a firm in Shreveport, they were open to the idea of giving her flexible employment, and that she could immediately begin the two-year training program. She would have to study for and take the Louisiana Bar Exam as well as learn how to write title opinions, a legal practice previously unknown to her.

(F) The Valuation of RJRK, LLC

¶59 Next, Ryan claims the court erred in disregarding the testimony of his expert and accepting the testimony of Mary Kate's expert regarding the valuation of an entity owned by the parties during their marriage, RJRK, LLC. However, as Mary Kate points out in her answer brief, Ryan's expert's calculation was dependent upon the existence of an operating or partnership agreement for the entity that does not appear in the record, was never produced by Ryan, was not examined by Ryan's expert, and was not used by Mary Kate's expert for his valuation.

(G) Life Insurance Policies

¶60 Next, Ryan takes issue with the order requiring him to obtain and maintain certain life insurance policies to secure both his alimony and child support obligations. The provision requires the following:

Respondent shall secure a life insurance policy on or before September 13, 2021, in an amount equal to the child support monthly obligations multiplied by the number of months the children are eligible under statute. In addition, Respondent shall acquire life insurance to secure the total support alimony on or before September 13, 2021. Should Respondent pass away and the payment of the insurance premium comes to fruition, Petitioner shall be entitled to only that amount of the proceeds for the remaining months the children are eligible to receive support under [the] statute and any amount of unpaid support alimony.

R. 807-08.

¶61 Ryan makes two separate arguments related to this provision. First, he argues that there was no reason for the insurance requirement because "[t]here is no evidence [he] ever failed to pay his support obligations." Brief-in-chief, 28. No support is provided for the proposition that requiring security for support obligations in a divorce decree must be tied to a party's likelihood of default. Reasons for default are myriad and not always in the control of the obligor. This argument is rejected, as Oklahoma law clearly allows a trial court to order such security for both child support, see Abrego v. Abrego, 1991 OK 48812 P.2d 806or other guarantee in order to be certain that child support obligations will be met."), and support alimony, see Younge v. Younge, 2002 OK 1241 P.3d 966

¶62 However, Ryan's second complaint as to this provision is well taken. He claims that the security requirement "should be limited to accrued amounts which remain unpaid" should he pass away. With this, we agree. Both Abrego and Younge are clear that if the security is needed (i.e., in this case, in the event of Ryan's untimely death), the recipient of the security may only recover amounts that had become due and were unpaid at the time of the obligor's death. Abrego, 1991 OK 48accrued payments which remain unpaid at the time of the parent's death and attorney fees and costs." (emphasis added)); Younge v. Younge, 2002 OK 1241 P.3d at 972due and unpaid at the time of an obligor's death does not operate to breach the long-settled rule that alimony be set in a sum certain." (emphasis added)). The provision in this case would require, upon Ryan's death, payment of obligations that had not yet accrued and is therefore unlawful. This portion of the decree is vacated, and the matter is remanded to the district court for the entry of a provision consistent with the cases cited herein.

(H) Equal Access to Children

¶63 Ryan's final proposition of error complains that temporary orders too often become final orders and that "stay-at-home-parents are incentivized during the pendency of a divorce[] to continue to stay home in order to continue the pattern of being the primary parent and continue being financially supported in the hopes a similar arrangement is merged into a final order." Brief-in-chief, 28. Though nominally titled a proposition of error, the section does not cite to any specific error but implies that the district court should have ordered Mary Kate back to working out of the home at the temporary order stage. Ryan does not state what judicial remedy he seeks on appeal for this alleged wrong. Where no error is cited, no error can be corrected.

(I) Appeal-Related Attorney Fees and Costs

¶64 In her appellate brief, Mary Kate requests appeal-related attorney fees. Title 12 O.S.2021 § 696.4

IV. CONCLUSION

¶65 Paragraph 17(d) of the decree is vacated, and the matter is remanded to the district court for the implementation of an amended decree that is consistent with Abrego v. Abrego, 1991 OK 48812 P.2d 806Younge v. Younge, 2002 OK 1241 P.3d 96643 O.S.2021 § 112.6

¶66 Mary Kate's request for appeal-related attorney fees does not comply with 12 O.S.2021 § 696.4

¶67 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

FISCHER, J., concurs, and BLACKWELL, J., concurs except as to Part III-B-2; concurs in result as to Part III-B-2.

 

FOOTNOTES

43 O.S. § 112.6Brief-in-chief, 2. This finding, he argues, led to a "landslide of other erroneous rulings including an award of sole custody to Mother, allowance of Mother's relocation to a city more than six hours away, and a significant attorney fee judgment against Father." Id. at 2-3. It appears that the only tangible consequence of the finding of domestic abuse was the award of attorney fees and an "encouragement" to attend counseling. R. 802. The district court did not reference the finding of domestic abuse in either its custody or relocation orders and supported both, as further discussed below, with evidence in the record independent of any domestic abuse finding. Nevertheless, a full review of the domestic abuse finding is warranted because it is clearly implicated in the award of attorney fees, it could be implicated in future litigation between the parties (if any), and the clear stigma associated with the finding.

Brief-in-chief, 10. The foregoing accounts completely belie this statement. Indeed, the bulk of Mary Kate's testimony was dedicated to relaying Ryan's matrimonial malfeasance.

[T]here were other incidents, I would say a dozen or more times, throughout the course of our marriage. He had a pattern of sometimes he would fly into a rage, getting really angry. He would be cursing and screaming and maybe would, like, walk around a corner or through a doorway or something and he would push me, shove me out of the door and slam the door in my face while he would say, "Get the F out or F off," or something to that effect.

Id. at 342. Additionally, testimony of two nannies supported the notion that Ryan's typical behavior was to talk down to Mary Kate and Mary Kate had to "walk on eggshells" around him because she seemed scared of him. Tr. Vol. I, 92, 95, 134. One nanny also relayed an incident where Ryan berated and cursed at Mary Kate for accidentally backing into the nanny's car. Id. at 92-94. Although Ryan generally denied anything in the way of abusive behavior, he did acknowledge many of his shortcomings. He admitted that Mary Kate had expressed her concerns about his behavior to him prior to her petitioning for divorce. Tr. Vol. V, 1158. He admitted that she was concerned about his "Jekyll and Hyde" personality and his anger, and acknowledged she felt like she was living in a minefield with him. Id. at 1159. He also admitted that she was concerned about him saying vicious, hateful things to her, screaming at her, putting her down, cursing, and blaming her for things, all in front of the children. Id. at 1159. See also, Petitioner's Exhibits 19, 23. He agreed he was made aware of these concerns when the parties attempted marriage counseling in the year prior to the divorce filing. These behaviors apparently were not addressed as he admitted that he failed to keep Mary Kate emotionally safe after she filed for divorce. Tr. Vol. V, 1171-72. See also, Petitioner's Exhibit 24, p. 16.

43 O.S.2021 § 110

The court may in its discretion make additional orders relative to the expenses of any such subsequent actions, including but not limited to writs of habeas corpus, brought by the parties or their attorneys, for the enforcement or modification of any interlocutory or final orders in the dissolution of marriage action made for the benefit of either party or their respective attorneys.

See e.g., 43 O.S.2021 § 111.143 O.S.2021 § 107.3

Friend and King involved an award of appellate attorney fees. In each case, the Court held that the party was or would have been entitled to attorney fees in the district court pursuant to the applicable fee statute or statutes and, therefore, was entitled to appellate attorney fees. When "a statute mandates an award of attorney fees in the trial court, the prevailing party is also entitled to recover appellate attorney fees; . . ." Friend, 2022 OK 29

43 O.S.2021 § 112.6

5 O.S. Ch. 1Burk Court set forth factors to provide guidance in determining a reasonable attorney fee:

1. Time and labor required. 2. The novelty and difficulty of the questions. 3. The skill requisite to perform the legal service properly. 4. The preclusion of other employment by the attorney due to acceptance of the case. 5. The customary fee. 6. Whether the fee is fixed or contingent. 7. Time limitations imposed by the client or the circumstances. 8. The amount involved and the results obtained. 9. The experience, reputation and ability of the attorneys. 10. The 'undesirability' of the case. 11. The nature and length of the professional relationship with the client. 12. Awards in similar cases.

Burk, 1979 OK 115

Brief-in-chief, 2-3. Although 43 O.S.2021 § 109.3

Brief-in-chief, 21-25, and we will address that issue alone.

See Abrego, 1991 OK 48or an agreed settlement, security may be required for child support payments accruing after a parent's death.") (emphasis supplied) and Younge, 2002 OK 12In the absence of agreement to the contrary, the trial court cannot award support alimony in an indefinite sum . . . .") (emphasis modified).

[A]n application for attorney fees for services performed on appeal shall be made to the appellate court by separate motion filed any time before issuance of mandate.

(B) Attorney's Fee. A motion for an appeal related attorney's fee must be made by a separately filed and labeled motion in the appellate court prior to issuance of mandate. The motion must state the statutory and decisional authority allowing the fee. See 12 O.S. § 696.4